UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

LEILANI J. LAKE,

                     Plaintiff,

v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security

                     Defendant.

Case No.:  16CV3021 GPC (JMA)

**REPORT AND
RECOMMENDATION OF
UNITED STATES MAGISTRATE
JUDGE**

    Plaintiff Leilani J. Lake ("Plaintiff") seeks judicial review of the determination by Defendant Nancy A. Berryhill, Acting Commissioner of Social Security ("Defendant"), that she is not entitled to disability insurance benefits.  The parties have filed cross-motions for summary judgment.  For the reasons set forth below, the Court recommends Plaintiff's motion for summary judgment be **DENIED** and Defendant's motion for summary judgment be **GRANTED**.

I.  **BACKGROUND**

    Plaintiff was born on April 12, 1955.  (Admin. R. at 193.)  She has a GED and completed four years of college coursework while attending the University of Alaska off and on between 1975 and 2011.  (Id. at 204, 411.)  She worked as an

officer manager for a worker's compensation insurance company in Alaska between 1986 and 2011. (Id. at 216-17, 411.) She received unemployment benefits from the State of Alaska between 2011 and 2013. (Id. at 199-200.) In an application for disability insurance benefits protectively filed on December 7, 2012, Plaintiff alleged a disability onset date of March 16, 2012 due to fibromyalgia, restless legs syndrome, irritable bowel syndrome, two compressed lumbar discs, depression, and osteoporosis. (Id. at 18, 193-94, 215.) Plaintiff's application was denied initially on June 20, 2013 and upon reconsideration on September 18, 2013. (Id. at 99-102, 107-09.) On October 7, 2013, Plaintiff requested an administrative hearing. (Id. at 112-13.) A hearing was conducted on June 8, 2015 in Seattle, Washington by Administrative Law Judge ("ALJ") Ilene Sloan, who determined on August 25, 2015 that Plaintiff was not disabled. (Id. at 18-30.) Plaintiff requested a review of the ALJ's decision; the Appeals Council for the Social Security Administration ("SSA") denied Plaintiff's request for review on November 10, 2016. (Id. at 1-4.) Plaintiff then commenced this action pursuant to 42 U.S.C. § 405(g).

## II.    MEDICAL EVIDENCE

### A.    Treating Physicians

#### 1.    Pre-2012

Plaintiff underwent gastric bypass in 2001, which resulted in weight loss from 298 to 128 pounds. (Admin. R. at 331.) She was diagnosed with fibromyalgia in 2008 or 2009 after having experienced symptoms for a year. (Id. at 267, 343.) Plaintiff's complaints of restless legs syndrome ("RLS"), irritable bowel syndrome ("IBS"), and insomnia date back to 2009 and before. (Id. at 267.) In 2009, she used hydrocodone (Vicodin) sparingly for fibromyalgia, and Mirapex for RLS. (Id.) In 2010, she reported stress and weight loss, was prescribed Lunesta for sleep issues, and was found to have depression with

16CV3021 GPC (JMA)

anxiety, in part due to divorcing her husband for a man she had met on the internet.  (Id. at 274, 277, 280.)  She continued to use Vicodin sparingly for fibromyalgia.  (Id. at 274.)  She took Klonopin twice per day, slept four hours per night, stayed on the computer at night to avoid her husband in bed, and went to work.  (Id. at 277.)  Her physician cautioned her against increasing her Vicodin use as this would lead to her becoming tolerant, and recommended she try yoga or other physical activity to help control her fibromyalgia.  (Id. at 292.)  A bone densitometry showed osteopenia of the left hip.  (Id. at 309.)  In November 2010, she told her physician she was moving out of state.  (Id. at 274.)

In April 2011, Plaintiff saw Dr. Jane M. Houtz, M.D. in Enumclaw, Washington, after having moved from Alaska three weeks prior, for refills of Prevacid (stomach acid reducer), Lexapro (antidepressant), Acyclovir (for herpes), Vicodin, methyltestosterone, and vitamin B12 injection.  (Id. at 328.)  She stated her fibromyalgia was flaring up so she was taking more Vicodin than usual, and explained she had tried Cymbalta and Lyrica in the past but had not tolerated it well.  (Id.)  She reported she was going through divorce after a 35-year marriage, but stated her depression was better.  (Id.)  Dr. Houtz noted multiple fibromyalgia tender points on exam, and recommended a trial of amitriptyline as well as increased activity.  (Id. at 327.)  In May 2011, Plaintiff presented with lower back pain and depression with increased tearfulness relating to money and boyfriend stressors.  (Id. at 325.)  She reported sleeping better since she had started amitriptyline.  (Id.)  Upon physical exam, she was able to bend at the waist with fingertips six inches from the floor, experienced some tenderness with lateral flexion, was nontender over her lumbar spine, had some tenderness over her bilateral SI joints, and had a negative straight leg raise test bilaterally.  (Id.)

**2.  2012**

On May 17, 2012, Plaintiff presented to Pacific Medical Center in

Washington and established treatment with Dr. Shailaja Reddy. (Id. at 348.) Plaintiff had not seen her previous physician, Dr. Houtz, for the past year as she lost her insurance and had just recently become reinsured. (Id.) Plaintiff reported she had seen several rheumatologists since being diagnosed with fibromyalgia, most recently Dr. Hollman two years before. (Id.) She had been placed on Cymbalta, which made her mood worse and did not help her fibromyalgia, so she instead took Vicodin intermittently for pain. (Id.) Her fibromyalgia pain was mainly in her neck, shoulders, arms, low back, and legs, and the pain was usually accompanied by fatigue and difficulty sleeping. (Id.) She was still taking pramipexole (Mirapex) for RLS, and also stated she had taken marijuana intermittently both for recreation and fibromyalgia pain. (Id. at 349.) She reported a history of genital herpes for which she had been on Acyclovir for 8-10 years, but because she had run out of the prescription a couple of months before and had not had any outbreaks, asked to remain off the medication. (Id.) Upon physical examination, Plaintiff exhibited tender points in the posterior neck and upper thoracic areas. (Id.) For Plaintiff's fibromyalgia, Dr. Reddy referred Plaintiff to rheumatology, suggested Lyrica, and explained the importance of exercise. (Id. at 350.) Dr. Reddy also advised Plaintiff she did not advocate the use of chronic narcotics for fibromyalgia, and thus denied a prescription for Vicodin. (Id.) In June 2012, Plaintiff complained of continued achiness in her neck, low back, hands, and legs, as well as ongoing fatigue. (Id. at 347.) Dr. Reddy assessed vitamin D and B12 deficiencies and osteopenia. (Id. at 348.)

In June 2012, Plaintiff saw rheumatologist Mary Wemple, M.D., upon Dr. Reddy's referral, for a fibromyalgia management consultation. (Id. at 343.) Plaintiff reported her fibromyalgia symptoms had been additive over the years. (Id.) Plaintiff stated her whole body was tender, and her arms hurt when her cat walked on her. (Id.) Her main areas of pain included her neck, low back, hips,

16CV3021 GPC (JMA)

and legs.  (Id.)  Her neck pain came and went, could be constant for several days, and was triggered by computer work and watching TV.  (Id.)  Plaintiff previously went to a pain clinic in Everett, where an injection helped, but massage did not as it was painful.  (Id.)  Plaintiff experienced constant pain across her low back, for which she had received acupuncture and lidocaine injections with temporary relief, and for which she used a TENS unit for pain relief.  (Id.)  She also had lateral hip pain, and experienced pain when going from a squat to standing.  (Id.)  Her legs ached all the time as if she had run a marathon.  (Id.)  She occasionally felt weak while getting out of a chair, climbing stairs, and walking.  (Id.)  She described her RLS as "a sick feeling" with spasms in her low back and jerking in her legs.  (Id.)  She took one Mirapex per day and on rare occasion, two per day.  (Id.)  She took up to six ibuprofen per day without much relief.  (Id.)  She found periodic Vicodin helpful; although it had not been prescribed to her, she wanted to have some on hand.  (Id.)  On physical exam, Plaintiff's hips showed excellent range of motion, but were painful with internal and external rotation and very tender at the lateral trochanters.  (Id. at 345.) Plaintiff's neck had some limitation in lateral rotation, and her shoulders had excellent range of motion and strength without pain.  (Id.)  Plaintiff had less than eleven out of eighteen fibromyalgia tender points.  (Id.)  Dr. Wemple assessed fibromyalgia with superimposed chronic myofascial neck and low back pain and degenerative disease, trochanteric bursitis, and sleep disturbance.  (Id. at 346.) Dr. Wemple's recommendations included:  MRIs of the cervical and lumbar spines; referral to physical therapy; referral to pain clinic; consider trial of nortryptiline for sleep as sleep management was essential for management of fibromyalgia pain; exercise encouraged; and consider Lyrica for leg pain if nortryptiline not successful.  (Id. at 346-47.)

In September 2012, Plaintiff saw Dr. Melissa Molsee of Pacific Medical Center to discuss fibromyalgia and whole skin burning and stinging, and to ask

16CV3021 GPC (JMA)

for a prescription for narcotics.  (Id. at 342.)  Dr. Molsee noted Plaintiff had not followed up with Dr. Reddy, her primary care provider, after her visit with Dr. Wemple.  (Id.)  Plaintiff declined a referral to dermatology for her skin pain.  (Id.)  Dr. Molsee refused to prescribe narcotics and instructed Plaintiff to follow up with Dr. Reddy.  (Id.)

In October, Plaintiff presented to Dr. Dana A. Swenson of Pacific Medical Center.  (Id. at 341.)  Plaintiff complained of diffuse body pain and explained she was normally seen at the Renton clinic.  (Id.)  She had pain in her shoulder, neck, arm, and legs, slept poorly, and continued to have a burning sensation on her skin.  (Id.)  She had started nortriptyline, but was bothered by daytime somnolence, and was afraid to try Lyrica, which had been suggested by Dr. Wemple.  (Id.)  She stated she walked 15-20 minutes per day for exercise.  (Id.)  Dr. Swenson recommended that Plaintiff see Dr. Neiman, a rheumatologist she had seen a few years ago, regarding her fibromyalgia, and that she restart bisphosphonate for her osteoporosis, for which she had taken no medications for the past year.  (Id.)

### 3.  **2013**

Plaintiff consulted with Dr. Neiman, rheumatologist, in January 2013, who noted he was seeing Plaintiff after a three year absence.  (Id. at 428.)  Plaintiff reported a burning sensation in her skin, mostly at night; not sleeping well; increasing pains in her neck, hips, and legs; and chronic pain in her knees.  (Id.)  She had stopped taking Mirapex for RLS due to nausea, and was taking Fosamax (bisphosphonate) for osteoporosis.  (Id.)  She also stated she had been divorced for five months, but was in a "very healthy relationship" with a new significant other with whom she planned to travel soon.  (Id.)  Dr. Neiman noted Plaintiff had a history of fibromyalgia "though examination today was benign." (Id. at 429.)  He was unable to determine the cause of Plaintiff's nerve pain.  (Id.)  He opined that Plaintiff's absorption of Fosamax could be poor due to her

16CV3021 GPC (JMA)

previous gastric bypass surgery, and suggested her primary physician consider Reclast IV.  (Id.)  He prescribed sixty Vicodin and warned Plaintiff to take them sparingly.  He stated, "There is no family history of addiction so I think it is relatively safe."  (Id.)  He also recommended that Plaintiff change her multivitamin as her paresthesias (tingling and burning sensations) and RLS could be due to poor absorption of trace minerals.  (Id.)

In May 2013, Plaintiff returned to Pacific Medical Center and saw Dr. Kathryn Pearson.  (Id. at 375.)  Plaintiff requested a renewal of her handicapped parking permit as her hip pain made it difficult to walk at times.  (Id.)  She described total body pain, but stated her hip and lower back symptoms were the worst.  (Id.)  Her RLS symptoms had not improved with pramipexole (Mirapex) and nortriptyline; she had not seen a neurologist for this condition.  (Id.)  Plaintiff stated she had fallen onto her left shoulder in January 2013 while in Arizona. (Id.)  Her active problems included fibromyalgia; osteopenia (for which she been on Boniva for one year in 2011, and on Fosamax for 2 years); RLS; IBS; and neck pain.  (Id.)  The only abnormal finding on Plaintiff's musculoskeletal exam was a prominent tender nodule over Plaintiff's left clavicle in her shoulder.  (Id. at 376.)  Dr. Pearson referred Plaintiff to neurology for her paresthesia and RLS, and to an orthopedist for her shoulder.  (Id.)  Dr. Pearson also queried whether Plaintiff had a vitamin deficiency due to her gastric bypass and not taking her medications regularly.  (Id.)

In June 2013, Plaintiff consulted with Dr. Robin Fuchs of ProOrtho regarding a fracture of her left clavicle, which she stated she had sustained after falling out of bed in a motor home in January 2013 in California.  (Id. at 418.)[1]  Dr.

---

[1] Plaintiff's records indicate she was in Yuma, Arizona in February and March 2013, and planned to drive back and return to Enumclaw, Washington in May 2013.  (Admin. R. at 423.)

16CV3021 GPC (JMA)

Fuchs discussed surgical and non-surgical options and opined that surgery would be challenging and could result in further complications.  (Id. at 419.)  Dr. Fuchs also noted Plaintiff's shoulder appeared quite functional.  (Id.)

Plaintiff returned to Dr. Neiman in June 2013.  (Id. at 452.)  He initiated weekly vitamin B12 injections and prescribed sixty pills of Vicodin with two refills.  (Id.)  Six months later, in December, Plaintiff saw Dr. Neiman again and reported having had one week of severe back pain.  (Id. at 442.)  Plaintiff had decided to wait until spring to start Reclast, but was back on Mirapex as Requip had not helped her RLS.  (Id.)  Other problems included IBS, incontinence, and depression.  (Id.)  Dr. Neiman noted on physical exam that Plaintiff was tender to palpation fairly diffusely, and opined Plaintiff's basic problem appeared to be chronic pain due to fibromyalgia.  (Id.)  He refilled her Vicodin, advised her to take one twice per day, noted she would be rechecked when she returned from a California-Arizona sojourn for the winter, and would start Reclast in the spring.  (Id.)

### 4.  **2014**

In April 2014, Plaintiff presented to Doctors Express in Oceanside, California with conjunctivitis.  (Id. at 473.)  In July and August 2014, Plaintiff called Dr. Neiman's office for a medication refill.  (Id. at 441.)  Dr. Neiman declined as Plaintiff had not been seen since December.  (Id.)

On July 26, 2014, Plaintiff was seen again at Doctors Express in Oceanside.  (Id. at 467.)  She described her history of fibromyalgia, and reported pain in her lower back and legs with a severity of seven out of ten.  (Id.)  She requested a prescription for hydrocodone/acetaminophen (Vicodin) and gabapentin to get her through her trip back to Washington.  (Id.)  Plaintiff exhibited spasm and tenderness of her paraspinal muscles.  (Id. at 469.)  She was provided with the requested prescriptions with no refills, and advised to follow up with her primary physician in two weeks.  (Id.)  Less than three weeks

later, on August 13, 2014, Plaintiff again presented to Doctors Express with complaints of intermittent back pain, eight on a scale of ten, made worse with movement.  (Id. at 460.)  She explained she would be trying to go back to Washington soon, but was in a lot of pain and was managing her pain with Norco (Vicodin).  (Id.)

In October 2014, Plaintiff visited Associated Gastro of Northwest in Kirkland, Washington regarding iron deficiency anemia.  (Id. at 505.)  She reported a history of fibromyalgia for which she had been taking an NSAID (non-steroidal anti-inflammatory drug) until recently.  (Id.)  She stated she had two drinks of alcohol per day and occasionally used marijuana.  (Id.)  Her medications included cyanocobalamin (vitamin B12) injectable, escitalopram (Lexapro), gabapentin, hydrocodone-acetaminophen (Vicodin), omeprazole (stomach acid reducer), pramipexole (Mirepex), and slow release iron.  (Id. at 506.)  Plaintiff was scheduled for an upper endoscopy, and was instructed to limit alcohol intake to five drinks per week and to avoid NSAID use.  (Id.)  A biopsy showed no diagnostic abnormality in Plaintiff's small intestine, and reactive gastropathy in Plaintiff's stomach.  (Id. at 497.)

In November 2014, Plaintiff saw Dr. Bryan MacWilliams in the emergency room at Evergreen Health.  (Id. at 499.)  She had not taken Mirapex and was starting to have spasms in her lower back causing severe pain.  (Id.)  Plaintiff appeared to be in pain with spasmodic movements and leg jerking; her lumbar musculature was moderately tender on exam.  (Id. at 501.)  Dr. MacWilliams prescribed Mirapex as requested.  (Id. at 499.)

A bone densitometry performed in December 2014 showed osteoporosis.  (Id. at 486-87.)

**B.    Examining Physicians**

   **1.    Hayden Hamilton, M.D. (May 2013)**

Plaintiff received an evaluation from Hayden Hamilton, M.D. in Federal

Way, Washington in May 2013.  (Id. at 367.)  Her chief complaints were back pain and fibromyalgia.  Plaintiff explained she had experienced twenty years of spontaneous back pain which she believed was secondary to previous obesity. She had various pain symptoms, but most consistently experienced a constant stabbing pain without any radiating symptoms.  (Id.)  Plaintiff also stated she had had fibromyalgia for approximately ten years which involved her entire body, but most significantly her abdomen and lower extremities.  At baseline, Plaintiff had an aching quality throughout her body, but experienced a throbbing sensation during the examination.  (Id.)  Plaintiff stated she experienced an exacerbation of her symptoms in cold weather, and had an improvement in her discomfort in warmer weather climates.  (Id. at 368.)  Plaintiff stated she lived with her daughter, and was independent with hygiene, dressing, and cooking, although she had difficulty on bad days due to pain, and her daughter assisted with chores around the house.  She had one glass of wine with dinner on most evenings, but denied the use of tobacco or other recreational drugs.  (Id.)

Dr. Hamilton found Plaintiff was tender to touch with light palpation in the eighteen areas consistent with fibromyalgia trigger points.  (Id. at 370.)  Dr. Hamilton listed Plaintiff's diagnoses as fibromyalgia; back pain, possibly secondary to fibromyalgia; impaired range of motion of bilateral shoulders, possibly secondary to fibromyalgia; impaired balance with unclear etiology; and impaired sensation with unclear etiology.  (Id.)  Dr. Hamilton opined that Plaintiff experienced a significant amount of pain secondary to her fibromyalgia and this seemed to limit her motor strength without any true deficits.  (Id.)  Dr. Hamilton found no limitations in Plaintiff's ability to stand and walk in an eight-hour workday with normal breaks, and no limitations in her ability to sit during an eight-hour workday with normal breaks.  (Id.)  He further found Plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently; should avoid climbing ladders and scaffolding, otherwise, no limitations on postural activities;

16CV3021 GPC (JMA)

no limitations on handling, reaching, fingering, and feeling; and should avoid working around heights, heavy machinery, extremes of temperature and chemicals.  (Id. at 371.)  MRIs conducted on the date of the examination showed mild degenerative changes of the thoracic spine and no significant lumbar spine abnormality.  (Id. at 365.)

### 2.    Enid Griffin, Psy.D. (May 2013)

On May 28, 2013, Plaintiff underwent a psychological evaluation with Enid Griffin, Psy.D.  (Id. at 410.)  Plaintiff told Dr. Griffin that she left her job as an officer manager in 2011 because of "stupidity, I met a man online and left my husband of 30 something years."  (Id. at 411.)  She moved from Alaska to marry this man, lost her entire retirement starting an auto repair shop business, and got divorced in 2012.  (Id.)  She had lived in Enumclaw with her daughter since 2011, and had been in a relationship with her current boyfriend for two years.  (Id.)  She drank alcohol daily consisting of "a couple rums and a few glasses of wine."  (Id.)  Plaintiff stated she had sleep problems due to pain and slept between five to six hours per night.  (Id. at 412.)  She was able to take care of her hygiene and laundry, and sometimes assisted her daughter with cooking.  She socialized with her boyfriend, who lived in Kirkland, during the weekends.  (Id.)  She explained she woke up around 3:00 a.m., played "Mafia Wars" online for a while, and then got back up around 6:00 or 6:30 a.m. and continued to play "Mafia Wars" during the day.  On the weekends, she and her boyfriend worked in the yard, went shopping, watched television, and soaked in the hot tub.  (Id.)

Dr. Griffin found that Plaintiff's reported symptoms met the criteria for Mood Disorder, Not Otherwise Specified ("NOS"), and Anxiety Disorder, NOS.  (Id. at 413.)  She recommended that Plaintiff receive intensive, consistent therapy.  Due to alcohol abuse and possible alcohol dependence, Dr. Griffin recommended she attend an alcohol assessment and follow any recommendations.  (Id.)  Overall, from a mental health standpoint, Dr. Griffin found it likely Plaintiff would be able

to engage in training and part-time work once she engaged in therapeutic and psychiatric interventions and her mental health symptoms had decreased.  (Id.) Dr. Griffin opined Plaintiff would likely be able to return to work within twelve months, but noted Plaintiff's reported health and pain issues could impact her ability to work and function.  (Id.)

**C.    Nonexamining Physicians**

State agency physicians reviewed Plaintiff's medical records at both the initial and reconsideration levels.  At the initial level, Dr. Christmas Covell, Ph.D. assessed Plaintiff's mental condition and determined Plaintiff to have mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace.  (Id. at 75.)  Dr. Covell clarified, "Claimant is able to carry out a normal work week engaged in simple as well as complex routines.  She is able to sustain concentration, pace and persistence when engaged in activities which are enjoyable to her, such as video games and travel.  She would not be precluded from sustaining a normal work week due to her depression or anxiety symptoms [even though they] are more than mild."  (Id. at 79.)  At the reconsideration level, Dr. Dan Donahue, Ph.D. concurred with Dr. Covell's mental assessment, and Dr. Gordon Hale, M.D. found the medical evidence supported the following physical residual functional capacity:  Lift and carry fifty pounds occasionally and twenty-five pounds frequently; stand, walk, and sit more than six hours on a sustained basis in an eight-hour workday; frequently stoop, kneel, crouch, and crawl; occasionally climb ladders, ropes and scaffolds; and avoid concentrated exposure to extreme cold, extreme heat, vibration, and hazards.  (Id. at 90, 92-93.)

**D.    Self-Reporting and Third-Party Evidence**

In a function report dated January 14, 2013, Plaintiff described how her condition limits her ability to work:  "In pain all the time, can't sit or stand for too

16CV3021 GPC (JMA)

long, memory issues so forget what is due and timelines.  Get sick from medications during day and fall asleep because I am so tired."  (Id. at 225.) Plaintiff provided similar information on her disability report on October 7, 2013. (Id. at 244.)

In a letter dated June 1, 2015, Plaintiff's boyfriend, Dennis Graham, stated he had known Plaintiff since May 2011 and had lived with her for three of those years, and thus had "had ample opportunity to observe her in every situation." (Id. at 262.)  He felt she was unable to work due to her occasional inability to recall discussions, her need to rest and nap every morning and every afternoon, and her inability to walk, stand, or sit for a long time.  (Id.)

## III.    THE ADMINISTRATIVE HEARING

### A.    Plaintiff's Testimony

At her June 8, 2015 administrative hearing, Plaintiff testified she stopped working in March 2011 because she left her husband and moved out of state. (Id. at 41.)  She tried to find employment in Washington, but was unable to do so due to issues with her memory and pain levels.  (Id.)  She tried to find work during the two years she collected unemployment benefits, from 2011 to 2013, and eventually exhausted her benefits.  (Id.)  When asked how she reconciled collecting unemployment, which required her to certify she was actively looking for work, while at the same time alleging she was totally disabled, Plaintiff explained her unsuccessful job search proved to her she was fully disabled as she was unable to find any jobs that could accommodate her condition.  (Id. at 43-44.)  She testified she met her boyfriend at a dance in May 2011, and said they were living together and in the process of moving to California.  (Id. at 44.) She stated he had a motorhome and took her "where the warmth is."  (Id. at 45.) She testified she was able to cook, shop for groceries, do laundry, and drive, but did not drive in the afternoons as she becomes "spacey" and sleepy after taking

16CV3021 GPC (JMA)

gabapentin and Mirapex between noon and 1:00 p.m.  (Id. at 46.)  She used to swim for exercise almost every day, but could now only manage once or twice per week, and could walk much less than she used to because "it's too hard on me to do that now."  (Id. at 47.)  If she walked more than a block, she started limping badly because of her hips and knees, and experienced excruciating pain.  (Id. at 48.)  At the time of the hearing, Plaintiff's medications included Mirapex three times per day, Lexapro at night, gabapentin three times per day, hydrocodone at night, Acyclovir once a week, pregabalin (Lyrica), and a B12 injection every other week.  (Id. at 48-49.)  She testified Mirapex helped her, and although Lexapro helped her depression, her dosage needed to be increased and she needed to attend counseling because "I get thoughts I should not be getting."  (Id. at 49.)  She played "Mafia Wars," an online role playing game, with "people all over the place."  (Id. at 50-51.)  She used to play nonstop, but realized it was too addictive so limited her play to half an hour per day.  (Id. at 52.)  She testified she sweeps the kitchen floor, but does not vacuum or dust.  (Id.)

Plaintiff stated she is unable to work because she cannot sit or stand for long periods of time, her fatigue level requires her to lie down and rest or sleep for hours during the day, and recall of words is difficult.  (Id. at 52-53.)  Her fibromyalgia has gotten worse over time, and she recalled that while in Alaska, she had started getting poor job reviews which had never occurred before.  (Id. at 53.)  She stated her employer's refusal to give her a job recommendation did not help her job search as she had worked for that employer for twenty-five years.  (Id.)  Plaintiff testified she slept six to seven hours per night and took a two hour nap during the day because "I am just so tired I just fall asleep."  (Id. at 57.)  She stated Dr. Neiman had told her there was nothing that could be done about the pins and needles sensations she experienced every night.  (Id. at 58.)  Her boyfriend helped her out of her chair often, and had to help her out of the car.  (Id. at 59.)  She testified she could lift and carry ten pounds for a short distance.

(Id. at 60.)  She concluded by stating she gets "spacey" and was feeling that way at the hearing.  (Id.)

### B.     <u>Vocational Expert's Testimony</u>

The vocational expert ("VE"), Paul Prachyl, Ph.D., testified Plaintiff's previous work consisted of the sedentary position of "bookkeeper."  (Id. at 63.) The ALJ set forth the following hypothetical:

> [A]ssume an individual with the past work you've described and the age and education of the claimant.  I'd ask you to further assume that this individual's able to work at the medium exertional level, except this individual would be able to unlimitedly climb ramps and stairs[;] [o]ccasionally climb ladders, ropes, and scaffolds[;] [u]nlimitedly balance[;] frequently stoop, kneel, crouch, and crawl.  This individual would need to avoid concentrated exposure to extreme cold and heat, vibrations and hazards such as moving machinery and unprotected heights.

(Id.)  The VE testified such an individual could perform both Plaintiff's past work as well as other work, including industrial cleaner, hand packager, and grinding and polishing laborer.  (Id. at 63-64.)  Plaintiff's past work would allow alternating between sitting and standing; the other work, as all work in the medium occupational base, would require standing and walking the whole day.  (Id. at 64.)  With respect to how much time an individual could take off before she would no longer be able to sustain employment, the VE testified it varies from employer to employer, but typically a deficit in production of ten percent would compel a supervisor to intervene, attempt remediation and, if unsuccessful, find a replacement.  (Id. at 65.)  The VE stated an employer would have no tolerance for taking extra breaks, and the tolerance for absenteeism was approximately one day per month.  (Id. at 66.)

//

//

16CV3021 GPC (JMA)

## IV. THE ALJ'S DECISION

After considering the record, ALJ Sloan made the following findings:

. . . .

> 2. The claimant has not engaged in substantial gainful activity since March 16, 2012, the alleged onset date [citation omitted].
>
> 3. The claimant has the following severe impairments: fibromyalgia, degenerative disc disease of the lumbar spine and cervical spine [citation omitted].[2]

. . . .

> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in [the Social Security regulations].

. . . .

> 5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) except she can unlimitedly climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; unlimitedly balance; frequently stoop, kneel, crouch, and crawl; avoid concentrated exposure to extreme cold and heat, vibration and hazards such as moving machinery and unprotected heights.

. . . .

> 6. The claimant is capable of performing past relevant work as a bookkeeper, DOT 210.382-014, sedentary work

---

[2] The ALJ determined Plaintiff's mood disorder, anxiety disorder, alcohol abuse, depression, conjunctivitis, iron deficiency, anemia, osteopenia (osteoporosis), IBS, and history of left distal clavicle fracture were nonsevere. (Admin. R. at 20-21.)

16CV3021 GPC (JMA)

with an SVP of 6.[3]  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity [citation omitted].

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills [citation omitted].

10.    In the alternative, considering the claimant's age, education, work experience, and residual functional capacity, there are other jobs that exist in significant numbers in the national economy that the claimant can also perform [citations omitted].

. . . .

11.    The claimant has not been under a disability, as defined in the Social Security Act, from March 16, 2012, through the date of this decision [citation omitted].

(Id. at 20-30.)

## V.    STANDARD OF REVIEW

To qualify for disability benefits under the Social Security Act, an applicant must show:  (1) He or she suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the

---

[3] Specific Vocational Preparation (SVP) indicates "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  Dictionary of Occupational Titles, app. C, available at 1991 WL 688702.  A SVP of 6 requires "over 1 year up to and including 2 years."  Id.

national economy.  <u>See</u> 42 U.S.C. § 423(d)(1)(A), (2)(A).  An applicant must meet both requirements to be "disabled."  <u>Id.</u>  Further, the applicant bears the burden of proving he or she was either permanently disabled or subject to a condition which became so severe as to disable the applicant prior to the date upon which his or her disability insured status expired.  <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1432 (9th Cir. 1995).

## A. **Sequential Evaluation of Impairments**

The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled."  The five steps are as follows:  (1) Whether the claimant is presently working in any substantial gainful activity.  If so, the claimant is not disabled.  If not, the evaluation proceeds to step two.  (2) Whether the claimant's impairment is severe.  If not, the claimant is not disabled.  If so, the evaluation proceeds to step three.  (3) Whether the impairment meets or equals a specific impairment listed in the Listing of Impairments.  If so, the claimant is disabled.  If not, the claimant's residual functional capacity ("RFC") is assessed and the evaluation proceeds to step four.  (4) Whether the claimant is able to do any work (s)he has done in the past.  If so, the claimant is not disabled.  If not, the evaluation continues to step five.  (5) Whether the claimant is able to do any other work.  If not, the claimant is disabled.  Conversely, if the Commissioner can establish there are a significant number of jobs in the national economy the claimant can do, the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4); <u>see also</u> <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098-99 (9th Cir. 1999).  The claimant's RFC is used at both step four and step five.  20 C.F.R. § 404.1520(a)(4).  RFC is "the most [one] can still do despite [one's] limitations."  20 C.F.R. § 404.1545(a)(1).  The evidence used to assess RFC includes all relevant medical and other evidence, the individual's statements, and descriptions and observations of the individual's limitations provided by the individual and other persons.  20 C.F.R. § 404.1545(a)(3).

16CV3021 GPC (JMA)

**B.   Judicial Review**

Sections 205(g) and 1631(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C.A. §§ 405(g), 1383(c)(3). The scope of judicial review is limited.  The Commissioner's final decision should not be disturbed unless:  (1) The ALJ's findings are based on legal error or (2) are not supported by substantial evidence in the record as a whole.  Schneider v. Comm'r Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000); Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014).  Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  The Court must consider the record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusion.  See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988).  Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed.  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009) (citation and quotations omitted).

Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C.A. § 405(g).  The matter may also be remanded to the SSA for further proceedings.  Id.

**VI.   DISCUSSION**

Plaintiff argues the ALJ erred by (1) failing to evaluate Plaintiff's fibromyalgia as required by Social Security Ruling ("SSR") 12-2p; (2) failing to properly evaluate Plaintiff's subjective symptom testimony, (3) not giving any weight to the opinions of Plaintiff's treating physicians; (4) failing to properly consider Plaintiff's mental impairments; and (5) failing to meet her burden at Step

Five of the sequential evaluation of impairments.  (Pl.'s Mem. at 11-24.)

## A.  <u>Application of SSR 12-2p</u>

Plaintiff contends the ALJ erred by failing to evaluate her fibromyalgia as mandated by SSR 12-2p.[4]  She argues the ALJ failed to address her treating doctors' opinions regarding fibromyalgia and did not consider the effect of her pain on her ability to work.  (<u>Id.</u> at 11-15.)

Fibromyalgia is "a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue."  <u>Benecke v. Barnhart</u>, 379 F.3d 587, 589 (9th Cir. 2004).  Typical symptoms of fibromyalgia include "chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue."  <u>Id.</u> at 589-90 (internal citations omitted).  The condition is unusual because those suffering from it have "muscle strength, sensory functions, and reflexes [that] are normal."  <u>Rollins v. Massanari</u>, 261 F.3d 853, 863 (9th Cir. 2001) (Ferguson, J., dissenting) (quoting Muhammad B. Yunus, <u>Fibromyalgia Syndrome: Blueprint for a Reliable Diagnosis</u>, Consultant, June 1996 at 1260).  A patient's joints appear normal, and musculoskeletal examination shows no objective joint swelling.  <u>Id.</u> (quoting Yunus, *supra*).  For years, fibromyalgia was poorly understood within the medical community, and there was "considerable skepticism" that fibromyalgia was a real disease.  <u>Revels v. Berryhill</u>, 874 F.3d 648, 656 (9th Cir. 2017) (citation and internal quotations omitted).

In 2012, the SSA issued SSR 12-2p to provide guidance on the evaluation of fibromyalgia in disability claims.  SSR 12-2p, at *1.  Generally, a claimant can establish she has a medically determinable impairment of fibromyalgia by

---

[4] Although SSRs do not have the same force and effect as statutes or regulations, they are binding on all components of the SSA.  20 C.F.R. § 402.35(b)(1).

16CV3021 GPC (JMA)

providing evidence from an acceptable medical source.  Id. at *2.  A physician's

diagnosis alone is not sufficient; the evidence must document that the physician

reviewed the claimant's medical history and conducted a physical exam.  Id.  The

ALJ should "review the physician's treatment notes to see if they are consistent

with the diagnosis of [fibromyalgia], determine whether the person's symptoms

have improved, worsened, or remained stable over time, and establish the

physician's assessment over time of the person's physical strength and

functional abilities."  Id.  The ruling provides two sets of specific criteria for

diagnosing the condition, based on the 1990 American College of Rheumatology

Criteria for the Classification of Fibromyalgia and the 2010 American College of

Rheumatology Preliminary Diagnostic Criteria, respectively.  Id.  Pursuant to the

first set of criteria, a person suffers from fibromyalgia if:  (1) she has widespread

pain that has lasted at least three months (although the pain may "fluctuate in

intensity and may not always be present"); (2) she has at least eleven positive

tender points out of eighteen specified points on her body;[5] and (3) there is

evidence that other disorders that could cause the symptoms were excluded.  Id.

at *2-3.  Pursuant to the second set of criteria, a person suffers from fibromyalgia

if:  (1) she has a history of widespread pain; (2) she has repeated manifestations

of six or more fibromyalgia symptoms, signs, or co-occurring conditions,

"especially manifestations of fatigue, cognitive or memory problems ("fibro fog"),

waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome";

and (3) there is evidence that other disorders that could cause the symptoms

were excluded.  Id. at *3.  When a claimant alleges fibromyalgia, "longitudinal

---

[5] The eighteen tender point sites are located on each side of the body at the occiput (base of
the skull); low cervical spine (back and side of neck); trapezius muscle (shoulder);
supraspinatus muscle (near the shoulder blade); second rib (top of the rib cage near the
sternum or breast bone); lateral epicondyle (outer aspect of the elbow); gluteal (top of the
buttock); greater trochanter (below the hip); and inner aspect of the knee.  SSR 12-2p, at *3.

16CV3021 GPC (JMA)

records reflecting ongoing medical evaluation and treatment from acceptable medical sources are especially helpful in establishing both the existence and severity of the impairment." Id.  In addition to obtaining evidence from a physician, the ALJ should consider evidence from other acceptable medical sources and nonmedical sources, should obtain a consultative examination, if necessary, and should evaluate the claimant's statements about her symptoms and functional limitations.  Id. at 4-5.

Plaintiff contends the ALJ failed to address the opinions of Plaintiff's treating doctors as required by SSR 12-2p.  She notes that every rheumatologist seen by Plaintiff diagnosed her with fibromyalgia, and argues each rheumatologist's opinion needed to be fully discussed by the ALJ.  (Pl.'s Mem. at 11-12.)  The ALJ, however, never questioned Plaintiff's diagnosis of fibromyalgia or her treating doctors' findings.  Indeed, the ALJ recognized the diagnosis of fibromyalgia as valid ("The claimant's medical evidence records indicate the appropriate diagnosis of fibromyalgia") and found this condition to be a severe impairment at step two.  (Admin. R. at 20, 23.)  However, a diagnosis of fibromyalgia does not mean one is presumptively disabled under SSR 12-2p, as Plaintiff contends.  (See Pl.'s Mem. at 13.)  Rather, SSR 12-2p still requires an ALJ to evaluate the severity and functional effects of a person's fibromyalgia and to use the 5-step sequential evaluation process to determine whether a person with a medically determinable impairment of fibromyalgia is disabled.  SSR 12-2p, at *4-6.[6]  Although fibromyalgia can be the basis for a finding of disability, it is not automatically so.  (See id. at *2.)

SSR 12-2p sets forth the evidence needed to establish a medically determinable impairment of fibromyalgia and explains how fibromyalgia should

---

[6] Fibromyalgia is not a listed impairment in the Listing of Impairments found at 20 C.F.R. pt. 404, subpt. P, app. 1.  SSR 12-2p, at *6.

16CV3021 GPC (JMA)

be evaluated in the context of the 5-step sequential evaluation process applied to all disability claims.  Plaintiff fundamentally misunderstands the application of SSR 12-2p.  One cannot be found disabled under SSR 12-2p, and the diagnosis of fibromyalgia does not lead to an automatic finding of disability.  Plaintiff has shown no error with respect to the ALJ's application of SSR 12-2p.

## B.    Subjective Symptom Testimony

Plaintiff next argues the ALJ erred by failing to properly evaluate Plaintiff's subjective symptom testimony.  She contends the ALJ did not use the proper legal standard under SSR 16-3p when the ALJ found Plaintiff's testimony regarding her symptoms to not be credible, and that the ALJ did not articulate "clear and convincing reasons" to discount Plaintiff's statements about her symptoms.  (Pl.'s Mem. at 15-20.)

An ALJ engages in a two-step analysis to determine the extent to which a claimant's report of her symptoms must be credited.  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.  Garrison, 759 F.3d at 1014 (citations and quotations omitted).  At step two, the ALJ must evaluate the intensity and persistence of the claimant's symptoms, such as pain, and determine the extent to which the symptoms limit her ability to perform work-related activities.  "If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so."  Id. at 1014-15 (citations and quotations omitted).

At the time of the ALJ's decision, SSR 96-7p provided that evaluation of a claimant's symptoms "requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects . . . ."  SSR 96-7p, at *1.  In March 2016, SSR 16-3p rescinded and superseded SSR 96-7p

16CV3021 GPC (JMA)

to "eliminat[e] the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term" and to "clarify that subjective symptom evaluation is not an examination of an individual's character" but instead should be consistent with the SSA's regulatory language regarding symptom evaluation. SSR 16-3p, at *2. SSR 16-3p instructs all adjudicators to "consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms" in order to determine how symptoms "limit ability to perform work-related activities." Id. SSR 16-3p became applicable on March 28, 2016, after the ALJ's decision in this matter, and therefore does not apply. Id.[7]; see also Rys v. Berryhill, 2018 WL 507207 (C.D. Cal. Jan. 19, 2018), at *3 n.3. The Ninth Circuit has stated the effect of SSR 16-3p is its clarification of "what our precedent already required: that assessments of an individual's testimony by an ALJ are designed to evaluate the intensity and persistence of symptoms . . . and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness." Trevizo v. Berryhill, 871 F.3d 664, 678 n.5 (9th Cir. 2017) (as amended) (citation and internal quotations omitted).

Here, at step one of the two-step process, the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," and did not make a finding of malingering. (Admin. R. at 25.) At the second step, however, the ALJ concluded Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible." (Id.) She set forth the following reasons for her finding: (1) Plaintiff collected unemployment benefits from 2011 to 2013; (2) Plaintiff was able to work at her previous job with the same conditions which

---

[7] SSR 16-3p explains, "Our adjudicators will apply this ruling when we make determinations and decisions on or after March 28, 2016. When a Federal court reviews our final decision in a claim, we expect the court will review the final decision using the rules that were in effect at the time we issued the decision under review." SSR 16-3p, at *13 n.27.

16CV3021 GPC (JMA)

she now alleges are disabling without any evidence her condition had worsened; (3) Plaintiff did not leave her work in 2011 for a reason related to disability; (4) Plaintiff's daily routine indicated her restrictions were not as great as alleged; (5) Plaintiff had not been fully compliant with treatment; (6) Plaintiff had made inconsistent statements; (7) Plaintiff retained the mental ability to operate a motor vehicle; and (8) the objective medical evidence did not fully support Plaintiff's allegations and her treatment notes reflected mild findings.  (Admin. R. at 25-27.)

## 1.    Receipt of Unemployment Benefits

With respect to her first proffered reason for discounting Plaintiff's symptom testimony, the ALJ explained:

> The claimant collected unemployment benefits from 2011 through the second quarter of 2013, until she exhausted those benefits.  In order to collect these benefits, the claimant had to certify she was ready, willing, and able to work and was actively looking for work.  [Citation omitted.]  Her affirmation that she was able to work during this time is inconsistent with the contention that she was also disabled during this time.

(Id. at 25.)  The receipt of unemployment benefits after the alleged onset date of disability (here, March 16, 2012) can "cast doubt on a claim of disability, as it shows that an applicant holds himself out as capable of working."  Ghanim v. Colvin, 763 F.3d 1154, 1165 (9th Cir. 2014).  Plaintiff contends she held herself out as disabled to prospective employers.  She testified, "I was honest with the few people who called me, you know, about . . . not being able, you know, my sitting and standing and, 'Well, we can't accommodate that.'  It was just proof to me that I was fully disabled."  (Admin. R. at 43-44.)  While the Court agrees Plaintiff's receipt of unemployment benefits for over a year after she alleged she was disabled does somewhat undermine her disability claim, the Court does not find this to be a clear and convincing reason to discount her symptom testimony, as her search for employment, which was ultimately unsuccessful, was not

necessarily inconsistent with her claim of disability.  This factor weighs neither for nor against the ALJ's evaluation of Plaintiff's pain testimony.

### 2. Plaintiff's Work History

The ALJ's observation that Plaintiff was not previously prevented from working despite the presence of her alleged impairment at approximately the same level of severity may constitute a clear and convincing reason to discredit Plaintiff's symptom testimony.  See Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997) (providing that an ALJ may properly consider a claimant's work record when weighing a claimant's credibility).  Therefore, the Court finds the ALJ's second reason for discounting Plaintiff's credibility, that Plaintiff was able to work until 2011, notwithstanding her fibromyalgia diagnosis in 2008 or 2009, to be clear and convincing.

### 3. Plaintiff's Reason for Leaving her Job

The ALJ's third stated reason for discounting Plaintiff's pain testimony is that Plaintiff left her work for a reason not related to disability.  An ALJ may consider why a claimant left her last place of employment when evaluating subjective symptom testimony.  See Bruton v. Massanari, 268 F.3d 824, 828 (9th Cir. 2001) (finding the ALJ could properly discount the claimant's pain testimony as the claimant left his job because he was laid off, rather than because he was injured).  Plaintiff does not allege she left her work in 2011 because of her symptoms.  Rather, she stated she left her job and moved from Alaska to Washington because of "stupidity, I met a man online and left my husband of 30 something years."  (Id. at 41, 411.)  The ALJ did not err in considering Plaintiff's reason for leaving her last place of employment in evaluating her credibility, and the Court finds this factor weighs in favor of the ALJ's evaluation of Plaintiff's pain testimony.

### 4. Plaintiff's Daily Activities

The ALJ's fourth proffered reason for discounting Plaintiff's symptom

testimony is that Plaintiff's daily activities were not limited to the extent one would expect given her complaints of disabling symptoms and limitations. (Id. at 25.) It is proper for an ALJ to consider the claimant's daily activities in making her credibility determination. See, e.g., Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); see also 20 C.F.R. §§ 404.1529(c)(3)(i) (claimant's daily activities relevant to evaluating symptoms). "One does not need to be 'utterly incapacitated' in order to be disabled." Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001) (citing Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)). Only if a claimant's level of activities is inconsistent with his or her claimed limitations would activities of daily living have any bearing on the claimant's credibility. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Here, Plaintiff's daily activities, namely her personal care, using the computer to chat, some yard work, household chores, shopping, driving, computer games, and reading (see Admin. R. at 25) are not determinative of disability. See Vertigan, 260 F.3d at 1050 ("the mere fact that a plaintiff has carried on certain daily activities…does not in any way detract from [plaintiff's] credibility as to [plaintiff's overall disability.") Regardless, "[e]ven where [Plaintiff's] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." Molina v. Astrue, 674 F.3d 1104 1113 (9th Cir. 2012). The Court finds that while Plaintiff's reported daily activities do not provide a clear and convincing reason to discount her symptom testimony, they do not necessarily help her establish disability, either, as they are not inconsistent with an ability to function in a workplace environment. Therefore, this factor weighs neither for nor against the ALJ's evaluation of Plaintiff's pain testimony.

### 5.   Compliance With Treatment

The ALJ's fifth reason for discounting Plaintiff's symptom testimony is that Plaintiff was not fully compliant with treatment. An ALJ may rely on the

failure to follow a prescribed course of treatment to discount the alleged severity of a claimant's symptoms.  See id. at 1113.  There are multiple references in the record relating to Plaintiff missing her medications.  See Admin. R. at 376 (Dr. Pearson questioning whether Plaintiff's vitamin deficiency was due to not taking medications regularly); 411 (Plaintiff reported to Dr. Griffin she had been on her medications for "6 months, but not steady, more steady lately"); 499 (referring to missed medications).  There is also an indication Plaintiff did not consistently follow up with her physicians.  See id. at 342 (Plaintiff had not follow up with Dr. Reddy after seeing Dr. Wemple).  The ALJ could properly surmise that Plaintiff's symptoms were not as severe as alleged.  The failure to fully comply with treatment recommended by her doctors constitutes a clear and convincing reason for the ALJ to discount Plaintiff's testimony.

### 6.  **Inconsistent Statements**

An ALJ may properly rely on statements by the claimant that are inconsistent with her own statements or actions, or with the medical evidence.  See, e.g., Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999).  The ALJ stated:

> The claimant has made inconsistent statements.  For instance, at the consultative examination, the claimant indicated her daughter does most of the household cleaning and cooking, due to the claimant's pain. [Admin. R. at 412.]  However, in her function report, completed just a few months earlier, she stated that she cooks her own meals on a daily basis and completes household chores on a weekly or daily basis.  [Id. at 227.]  At the hearing, she testified that she does not do most of the chores.  Yet, in her function report, she indicated she completes household chores on a weekly or daily basis.  [Id.]  In her function report, she stated she attends church, but at the hearing, she inconsistently testified she does not attend church.  The claimant's allegations that she gets groggy and loses the ability to focus is also inconsistent with her ability to read novels, drive and play complex story-based video games such as "Mafia Wars."  The claimant testified

16CV3021 GPC (JMA)

she played that game multiple hours and liked to chat with people all over the world and cut back due to becoming too addicted, not due to grogginess or an inability to focus.

(Admin. R. at 25.)  Although Plaintiff contends the ALJ could not rely on such factors under SSR 16-3p, as discussed above, 16-3p was not applicable at the time of the ALJ's decision.  The ALJ properly considered Plaintiff's inconsistent statements in discrediting Plaintiff's symptom testimony.

### 7.    **Ability to Drive**

The ALJ determined Plaintiff's mental ability to operate a motor vehicle conflicted with her symptom testimony.  (Id. at 25-26.)  She stated, "While [Plaintiff] contends that her functional abilities are severely limited, it is difficult to reconcile the fact that [she] testified she operates a motor vehicle."  (Id. at 26.)  Defendant, however, appears to concede this does not constitute a clear and convincing reason to discount Plaintiff's testimony; the Court agrees.

### 8.    **Objective Medical Evidence**

Although an ALJ may not disregard a claimant's testimony "*solely* because it is not substantiated affirmatively by objective medical evidence" (see Robbins, 466 F.3d at 883 [emphasis added]), the ALJ may consider whether the alleged symptoms are consistent with the medical evidence as one factor in her evaluation.  See Lingenfelter v. Astrue, 504 F.3d 1028, 1040 (9th Cir. 2007); see also Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis.").  Here, the ALJ's observation that Plaintiff had few objective findings to support her allegations is accurate.  As discussed by the ALJ, Plaintiff often presented with unremarkable findings on physical exam, including normal range of motion, negative straight

leg raising, normal motor strength, and normal reflexes.  (Admin. R. at 27.)
However, as discussed above, fibromyalgia is a complex medical condition in
which a person can exhibit muscle strength, sensory functions, reflexes, and
joints that appear normal, with "pain that may fluctuate in intensity and may not
always be present."  SSR 12-2p, at *2; <u>Rollins</u>, 261 F.3d at 863 (quoting Yunus,
*supra*, at 1260).  While the ALJ did not err by considering whether Plaintiff's
symptoms were supported by objective medical evidence, the Court finds this
factor neither weighs in favor of nor detracts from the ALJ's analysis of Plaintiff's
pain testimony.

It is not for this Court to reweigh the hearing evidence regarding Plaintiff's
subjective symptom testimony.  Rather, this Court is limited to determining
whether the ALJ identified specific, clear and convincing reasons for discounting
Plaintiff's testimony.  An ALJ's assessment of symptom severity and claimant
credibility is entitled to "great weight." <u>Weetman v. Sullivan</u>, 977 F.2d 20, 22 (9th
Cir. 1989).  Although not all of the reasons set forth by the ALJ are clear and
convincing, the Court concludes the ALJ articulated sufficient specific, clear and
convincing reasons supported by substantial evidence to discount Plaintiff's
subjective symptom testimony.

## C.   **Evaluation of Treating Physicians' Opinions**

Plaintiff next argues the ALJ erred by ignoring the opinions of Plaintiff's
treating physicians.  (Pl.'s Mem. at 10-11.)  In particular, Plaintiff maintains the
ALJ was obligated to discuss the findings of her rheumatologists, Dr. Wemple,
Dr. Wood, and Dr. Neiman, as well as her primary physicians, Drs. Saaman,
Swenson, Laohaprasit, and Houtz.  (Pl.'s Mem. at 12-13, 20-21; Reply at 6-7.)
Plaintiff contends the ALJ's failure to discuss these doctors' opinions should
result in the crediting of these opinions as a matter of law.  (Reply at 7.)

"The medical opinion of a claimant's treating doctor is given 'controlling
weight' so long as it is 'well-supported by medically acceptable clinical and

16CV3021 GPC (JMA)

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" <u>Revels</u>, 874 F.3d at 654. "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), diagnosis, and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a). "In disability benefits cases . . . physicians may render medical, clinical opinions, or they may render opinions on the ultimate issue of disability–the claimant's ability to perform work." <u>Reddick</u>, 157 F.3d at 725. There are three types of physicians in such cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995). Generally, a treating physician's opinion is given more weight by the SSA than a nontreating physician's opinion. <u>Id.</u>; <u>see</u> <u>also</u> 20 C.F.R. § 404.1527(c)(2). If the treating physician's opinion is contradicted by another doctor, the ALJ may reject the opinion only by giving "specific and legitimate" reasons for doing so that are based on substantial evidence in the record. <u>Id.</u> (citing <u>Murray v. Heckler</u>, 722 F.2d 499, 502 (9th Cir. 1983)). "An ALJ can satisfy the 'substantial evidence' requirement by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings." <u>Garrison</u>, 759 F.3d at 1012 (quotations and citation omitted).

Here, the ALJ gave "significant weight" to the opinions of Dr. Hamilton and Dr. Hale, who both concluded Plaintiff could perform medium work. (Admin. R. at 27-28.) The ALJ stated, with respect to Dr. Hamilton's opinion, "I give this opinion great weight as it is consistent with the claimant's testimony regarding her daily activities and consistent with the medical evidence. The medical evidence indicates the claimant has some pains and aches, but she is capable of

performing at the level Dr. Hamilton indicates." (Id. at 27.) Moreover, "[t]here is no evidence of significant abnormalities that would require further restriction and based on the claimant's testimony, she is capable of doing household chores, travelling according to the weather, and gardening." (Id.) The ALJ further noted Dr. Hamilton's opinion was consistent with that of state agency physician Dr. Hale. (Id.) She found Dr. Hale's opinion was "consistent with the medical evidence record as the medical findings of limitation are fairly limited in this case." (Id. at 28.)

Plaintiff correctly observes that all of her treating doctors diagnosed her with fibromyalgia. However, her assertion that the ALJ erred by not discussing their "findings" lacks basis. None of Plaintiff's treating doctors provided an opinion on her functional capacity or limitations, the nature and severity of her impairment, or whether she is disabled, nor did any of them contradict Dr. Hamilton's and Dr. Hale's opinions that Plaintiff could perform medium work. The ALJ implicitly "credited" the treating physicians' opinions that Plaintiff has fibromyalgia by considering Plaintiff's fibromyalgia a severe impairment at step two. The ALJ did not reject any of the treating physicians' opinions because other than their diagnoses, there were no medical opinions to reject. Again, a "medical opinion" is a statement reflecting the doctor's judgment about the nature and severity of impairment, diagnosis, prognosis, and physical or mental restrictions. See 20 C.F.R. § 404.1527(a). Plaintiff's treating doctors expressed no medical opinions beyond their diagnoses of fibromyalgia and their recommendations for treatment. Because the ALJ concurred with their diagnoses of fibromyalgia, and because there were no opinions offered regarding the severity of Plaintiff's impairment or her functional limitations or ability to work, there was nothing for the ALJ to reject. Notably, Plaintiff does not specify which parts of the doctors' opinions the ALJ was required to discuss and explicitly reject, and her argument appears to rest upon her mistaken belief that a

16CV3021 GPC (JMA)

diagnosis of fibromyalgia leads to a presumptive finding of disability. <u>See</u> Pl.'s Mem. at 13. She cites no authority for this proposition and, as discussed above, the SSR explicitly dealing with fibromyalgia, 12-2p, confirms this is not the case.

In fibromyalgia cases, SSR 12-2p directs an ALJ to consider "longitudinal records reflecting ongoing medical evaluation and treatment" and to "review the physician's treatment notes to see if they are consistent with the diagnosis of [fibromyalgia], determine whether the person's symptoms have improved, worsened, or remained stable over time, and establish the physician's assessment over time of the person's physical strength and functional abilities." SSR 12-2p, at *2, *3. The ALJ adequately considered Plaintiff's longitudinal records. (Admin. R. at 26-27.) She considered the record as a whole, and concluded Plaintiff's treatment records reflected mild findings. (<u>Id.</u>) Although Plaintiff criticizes the ALJ for not explicitly naming each treating doctor by name, the ALJ was not required to do so. <u>See</u> <u>Howard ex rel. Wolff v. Barnhart</u>, 341 F.3d 1006, 1012 (9th Cir. 2003) (finding the ALJ is not required to discuss every piece of evidence). Additionally, the Court has carefully reviewed the records of the physicians identified by Plaintiff as requiring further discussion by the ALJ, and finds no information within them that would have significantly altered any of the ALJ's findings. Dr. Wemple saw Plaintiff only once, found some positive tender points, diagnosed chronic neck and back pain in addition to fibromyalgia, and provided recommendations for fibromyalgia management. (Admin. R. at 343-47.) There are no records authored by Dr. Wood in the medical record. Rather, the record contains a letter addressed *to* Dr. Wood. (<u>Id.</u> at 267.) Dr. Neiman corroborated Plaintiff's diagnosis and prescribed medications and vitamins, but offered no opinions on severity, prognosis, or limitations. (<u>Id.</u> at 428-29, 442-43, 452.) The records of Drs. Saaman and Laohaprasit predate Plaintiff's alleged disability onset and offer no opinions or findings bearing upon Plaintiff's disability. (<u>Id.</u> at 267-68, 274-75, 277-78.). Dr. Swenson saw Plaintiff

16CV3021 GPC (JMA)

only once and referred her to Dr. Neiman.  (Id. at 341.)  Dr. Houtz similarly confirmed Plaintiff's fibromyalgia diagnosis, prescribed medications, and offered recommendations for management of her condition.  (Id. at 325, 327-28.)  Nothing in any of these doctors' records contributes to the ultimate question of whether Plaintiff is disabled.

Plaintiff contends her treating physicians' opinions should be credited as a matter of law, but provides no explanation of precisely which part of their opinions should be credited, or how they would affect the outcome of her case.  Every physician – treating, examining, and nontreating – found Plaintiff had fibromyalgia, and the ALJ concurred.  Plaintiff's treating physicians did not offer any opinions on Plaintiff's functional limitations or the issue of disability, and thus there was nothing further for the ALJ to either discount or reject.  The Court finds the ALJ did not commit error with respect to her evaluation of Plaintiff's treating physicians' opinions.

### D.  Mental Limitations

Plaintiff argues the ALJ erred by not applying the special procedures required when a claimant presents a colorable claim of mental impairment and by failing to incorporate Plaintiff's mental limitations into her RFC.  (Pl.'s Mem. at 21-23.)  Where there is evidence of a mental impairment, the SSA has supplemented the five-step sequential evaluation process described above with a special technique to assist the ALJ in evaluating the mental impairment.  Keyser v. Comm'r Soc. Sec. Admin., 648 F.3d 721, 725 (9th Cir. 2011); see also 20 C.F.R. § 404.1520a.  This technique requires the ALJ to determine whether the claimant has a medically determinable mental impairment (see 20 C.F.R. § 404.1520a(b)); rate the degree of functional limitation in four functional areas (activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation) (id. § 404.1520a(c)); determine the severity of the mental impairment (id. § 404.1520a(d)); and then, if the impairment is found

16CV3021 GPC (JMA)

to be severe, proceed to step three of the disability analysis to ascertain if the impairment meets or is equivalent in severity to a listed mental disorder (id., § 404.1520a(d)(2)).[8]  The written decision after an ALJ hearing "must incorporate the pertinent findings and conclusions based on the technique" and "must include a specific finding as to the degree of limitation in each of the functional areas." Id. § 416.920a(e)(4).

The ALJ found Plaintiff had medically determinable impairments of mood disorder, anxiety disorder, alcohol abuse, and depression, but found them to be non-severe at step two of the five-step sequential process:

> In making this finding, I have considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments [citation omitted].  These four broad functional areas are known as the "paragraph B" criteria.
>
> The first functional area is activities of daily living.  In this area, the claimant has mild limitation.  The claimant reports her daily routine includes dressing herself, walking, standing, using the computer to chat, reading, and some yard work.  She has no problems with any personal care.  She prepares all her own meals, three times per day, seven days a week.  She reports she tries to maintain a healthy diet and so her food takes a little longer to prepare.  She does not require any encouragement to complete daily chores.  She completes household chores such as cleaning her home, laundry, making the bed, loading the dishwasher, and yard work on a daily or weekly basis. She shops for her own food and clothing, and shops for 30 minutes to one hour on a weekly basis.  She likes to go outside daily, is able to walk, bike, drive, and go to places

---

[8] An update to section 404.1520a effective January 17, 2017 (after the ALJ's decision in this case) amended the four functional areas in which the SSA rates the degree of functional limitation.  These four functional areas presently include:  (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself.  20 C.F.R. § 404.1520a (2017).

16CV3021 GPC (JMA)

on her own. For hobbies, she enjoys playing computer games, reading, sewing and knitting. She indicates she can walk one mile before needing rest and can resume walking after 10 to 15 minutes of rest. [Citation omitted.] Accordingly, the claimant has no more than a mild limitation in this area.

The next functional area is social functioning. In this area, the claimant has mild limitation. The claimant reports she spends time with others. She maintains contact with friends and loved ones by talking daily on the phone, video-chatting using web programs such as Skype, and by maintaining and browsing Facebook pages. She is involved in a long-term relationship and visited her boyfriend on a regular basis before moving in with him. She also attends church or other events one or two times per month. She notes that her social activities are reduced due to pain, but does not mention a mental limitation. [Citation omitted]. In her consultative examination, she stated she has a good relationship with her daughter and her daughter's boyfriend's son. She described her relationship with her significant other as very good. [Citation omitted.] The claimant testified she currently lives with her boyfriend and they plan to move to California for the warmer climate in the near future and move once again when the weather becomes too warm. She has friends, and while she does not go out much, she does have friends over for dinner. This indicates the claimant has multiple strong interpersonal relationships and is able to function socially. Accordingly, the claimant has no more than a mild limitation in this area.

The third functional area is concentration, persistence or pace. In this area, the claimant has mild limitation. The claimant alleges trouble concentrating for more than 15 minutes, but her statements are inconsistent. She indicated she does not need any reminders to take care of personal needs and remembers to take her medication with the use of a pill minder. She is able to pay her own bills, count change, and handle a checking and savings account. She finishes tasks she starts and indicates she

16CV3021 GPC (JMA)

is capable of following written and spoken instructions. [Citation omitted.] In her consultative examination, she was noted to only have a slight memory impairment. She made one error in completing serial 7's, and no errors in completing serial 3's. Generally, aside from slight impairments in memory and judgment, the claimant's mental status exam was normal. [Citation omitted.] Accordingly, the claimant has no more than a mild limitation in this area.

The fourth functional area is episodes of decompensation. In this area, the claimant has experienced no episodes of decompensation which have been of extended duration.

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, they are nonsevere (20 CFR 404.1520a(d)(1)). Additionally, the claimant testified she is not in any treatment pertaining to any mental impairment. She has had no symptoms or episodes, such as panic attacks, hospitalizations for mental health, or hallucinations, which would indicate more than a mild limitation due to mental impairment. [Citation omitted.] The claimant was described as having a normal mood and affect during a doctor's visit on July 26, 2014 and she denied anxiety/nerves and depression to her health provider April 12, 2014 and on August 13, 2014. [Citation omitted.]

(Admin. R. at 21-22.) The ALJ further gave the opinion of Dr. Griffin, the consultative psychologist, significant weight. (Id. at 22-23.) As set forth above, Dr. Griffin found that from a psychological standpoint, Plaintiff would be able to engage in full time work within twelve months with treatment. (Id. at 413.) Contrary to Plaintiff's assertions, the ALJ did apply the special technique required when a claimant alleges mental limitations, and substantial evidence supports her finding that Plaintiff's mental impairments are not severe.

16CV3021 GPC (JMA)

Plaintiff also contends the ALJ erred by failing to include her mental limitations in her RFC assessment. "RFC is a multidimensional description of the work-related abilities [a claimant] retain[s] in spite of [her] medical impairments." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A). Here, the ALJ found Plaintiff had the RFC to perform medium work. (Admin. R. at 24.) Because she found Plaintiff had no more than minimal limitations in her ability to perform basic mental work activities, she did not include any mental restrictions in the RFC. Again, it is not enough, as Plaintiff apparently believes, to be diagnosed with mood disorder and anxiety disorder. Plaintiff presents no specifics concerning how her mood and anxiety disorders affect her ability to work other than to speculate that "[a]n applicant with a mood disorder might have problems focusing, following orders or understanding because of their distraction." (Pl.'s Mem. at 23.) The Court has reviewed the record as a whole, and weighed both the evidence that supports and which detracts from the ALJ's findings. See, e.g., Magallanes v. Brown, 881 F.2d 747, 750 (9th Cir. 1989). Upon a thorough consideration of the record, the Court finds the ALJ properly found Plaintiff's mental impairments did not result in any functional limitations required to be included in Plaintiff's RFC.

**E.  Plaintiff's Past Relevant Work**

Plaintiff contends the ALJ erred in her determination at step five of the sequential evaluation of impairments by finding Plaintiff could perform work as an industrial cleaner, hand packager, and grinding polishing laborer, each of which constitutes medium work. (Pl.'s Mem. at 23-24.) Plaintiff further argues that she is disabled under the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2 (commonly referred to as the "grids"). As Defendant observes, however, the ALJ was not obligated to even reach step five, as she found Plaintiff capable of performing her past relevant work at step four. See Tackett, 180 F.3d at 1098-99 (explaining five-step sequential process). The ALJ could have

16CV3021 GPC (JMA)

ceased her analysis at step four without ever reaching step five.  (Id.)  Moreover, Plaintiff's basis for arguing she could not perform her past relevant work or the medium work identified by the VE is threadbare; Plaintiff claims only that her treating physicians "state [her] limitations as to pain, depression, and difficulty with mobility preclude her from fully functioning."  (Reply at 13.)  As discussed above, however, Plaintiff's treating doctors made no findings at all regarding Plaintiff's work limitations.

Plaintiff relies upon Medical-Vocational Rule 201.04 to argue she would be found to be "disabled" under the grids.  Rule 201.04 corresponds to a person with the residual functional capacity to perform sedentary work, advanced age (55 or over), high school graduate or more, with only "unskilled" or no previous work experience.  See 20 C.F.R. pt. 404, subpt. P, app. 2, § 201.04.  The VE testified that Plaintiff's prior work as a bookkeeper corresponded to the *Dictionary of Occupational Titles* ("DOT") code number 210.382-014.  (Admin. R. at 63.)  The description of the bookkeeper position makes it clear it is not an "unskilled" position.  See DOT 210.382-014, available at 1991 WL 671821.[9]  A bookkeeper requires a reasoning level allowing one to "[a]pply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists."  Id.  Additionally, although the VE did not testify in this matter whether the position of bookkeeper is skilled, semi-skilled, or unskilled, VEs in other cases have classified the position as skilled.  See, e.g., Terrazas v. Astrue, 2011 WL 1239814, at *5 (E.D. Cal. 2011);

---

[9] Occupations are classified as unskilled, semi-skilled, or skilled.  20 C.F.R. § 404.1568. "'Unskilled work' is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  Id., § 404.1568(a).  "'Semi-skilled' work is work which needs some skills but does not require doing the more complex work duties."  Id., § 404.1568(b).  "'Skilled work' requires qualifications in which a person uses judgment . . . in order to obtain the proper form, quality, or quantity of material to be produced."  Id., § 404.1568(c).

16CV3021 GPC (JMA)

<u>Martinez v. Commissioner of Soc. Sec.</u>, 2013 WL 3934023, at *3 (E.D. Cal. 2013).

Plaintiff has not presented a persuasive argument that the ALJ erred by finding she could perform her past relevant work as a bookkeeper, and the Court finds no error.

## VII.    CONCLUSION

For the reasons set forth above, the Court recommends Plaintiff's motion for summary judgment be **DENIED** and Defendant's motion for summary judgment be **GRANTED**.

This report and recommendation will be submitted to the Honorable Gonzalo P. Curiel, United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Any party may file written objections with the Court and serve a copy on all parties on or before **February 14, 2018**.  The document should be captioned "Objections to Report and Recommendation." Any reply to the Objections shall be served and filed on or before **February 23, 2018**.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the district court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated:  January 31, 2018

Honorable Jan M. Adler
United States Magistrate Judge

16CV3021 GPC (JMA)