1
2
3
4
5
6
7                    UNITED STATES DISTRICT COURT

8                  SOUTHERN DISTRICT OF CALIFORNIA

9

10   LEILANI J. LAKE,                    Case No.:  3:16-cv-03021-GPC-JMA

11                        Plaintiff,
                                        **ORDER ADOPTING IN PART THE**
12   v.                                 **REPORT AND**
                                        **RECOMMENDATION**
13   NANCY A. BERRYHILL, Acting         **DENYING PLAINTIFF'S MOTION**
     Commissioner of Social Security,   **FOR SUMMARY JUDGMENT**
14                                      **AND GRANTING DEFENDANT'S**
                         Defendant.     **MOTION FOR SUMMARY**
15                                      **JUDGMENT**
                                        **[ECF NO. 13, 16, 21]**
16

17

18         Plaintiff Leilani J. Lake ("Plaintiff") seeks judicial review of the determination of

19   Defendant, Commissioner of Social Security[1] ("Defendant"), that she is not entitled to

20   disability insurance benefits ("DIB").  (*See* ECF No. 1.[2])  The parties have filed cross-

21   motions for summary judgment.  (*See* ECF No. 13 (Plaintiff's motion); ECF No. 16

22   (Defendant's motion).)  On January 31, 2018, Magistrate Judge Jan M. Adler issued a

23

24   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

25   [1] When Plaintiff filed her complaint on December 13, 2016, the Acting Commissioner of Social Security
     was Carolyn Colvin.  However, on January 23, 2017, Nancy Berryhill became the Acting Commissioner
26   of Social Security and remains so positioned.
     [2] ECF page numbers are based on CM/ECF pagination.
27

28
                                        1

report and recommendation ("Report") recommending Plaintiff's motion for summary judgment be denied and that Defendant's cross-motion for summary judgment be granted. (ECF No. 21.) On February 14, 2018, Plaintiff filed Objections to the Report. (ECF No. 23.) Defendant has not filed a reply to Plaintiff's Objections.[3] After careful consideration of the pleadings, the supporting documents, and the applicable law, the Court **ADOPTS IN PART** the Magistrate Judge's Report **DENYING** Plaintiff's Motion for Summary Judgment and GRANTING Defendant's Motion for Summary Judgment.

## I.    BACKGROUND

After cross-referencing the administrative record, the Court recites the facts as substantially presented in the Report. (ECF No. 21 at 2-17.)

On December 7, 2012, Plaintiff filed an application for DIB under Title II and Part A of Title XVIII of the Social Security Act ("Act"). (AR 193-94.[4]) Plaintiff's application was denied initially on June 20, 2013. (AR 99.) Upon reconsideration on September 18, 2013, it was denied again. (AR 107.) On October 7, 2013, Plaintiff requested an administrative hearing. (AR 112-13.) On June 8, 2015, Plaintiff received a hearing in Seattle, Washington before Administrative Law Judge ("ALJ") Ilene Sloan. (AR 18-30.) On August 25, 2015, the ALJ determined that Plaintiff was not disabled. (*Id.*) On November 10, 2016, the Appeals Council for the Social Security Administration ("SSA") denied Plaintiff's request for review of the ALJ's decision. (AR 1-4.) Accordingly, Plaintiff commenced this action pursuant to 42 U.S.C. § 405(g).

Plaintiff was born on April 12, 1955. (AR 193.) She has a GED and completed four years of college coursework while attending the University of Alaska off and on between 1975 and 2011. (AR 204, 411.) She worked as an office manager for a worker's compensation insurance company in Alaska between 1986 and 2011. (AR 216-

---

[3] Defendant was given a filing deadline of February 23, 2018, which has passed. (*See* ECF No. 21.)
[4] "AR" citations refer to the administrative record and its accompanying pagination.

17, 411.)  She received unemployment benefits from the State of Alaska between 2011 and 2013.  (AR 199-200.)  Plaintiff alleged a disability onset date of March 16, 2012 due to fibromyalgia ("FM"), restless leg syndrome ("RLS"), irritable bowel syndrome ("IBS"), two compressed lumbar discs, depression, osteoporosis, and osteopenia.  (AR 215.)

## II.    MEDICAL EVIDENCE

### A.    Treating Physicians

#### 1.    Pre-2012

Plaintiff underwent gastric bypass surgery in 2001.  (AR 331.)  She was diagnosed with FM in 2008 or 2009 after having experienced symptoms for a year.  (AR 267, 343.)  Plaintiff's complaints of RLS, IBS, and insomnia date back to 2009 and before.  (AR 267.)  In 2009, Plaintiff used hydrocodone (Vicodin) sparingly for FM, and Mirapex for RLS.  (*Id.*)  In 2010, she was diagnosed with depression and anxiety; she was also prescribed Lunesta for sleep issues.  (AR 274, 277, 280.)  She continued to use Vicodin sparingly for FM.  (AR 274.)  She took Klonopin twice daily, slept four hours nightly, and stayed on the computer at night.  (AR 277.)  Plaintiff's physicians cautioned her against increasing her Vicodin as tolerance could develop; instead, they recommended Plaintiff try physical activity to control her FM symptoms.  (AR 292.)  A bone densitometry showed osteopenia of the left hip.  (AR 309.)

In April 2011, Plaintiff saw Jane M. Houtz, M.D.  (AR 328.)  Dr. Houtz provided refills for Prevacid (stomach acid reducer), Lexapro (antidepressant), Acyclovir (herpes treatment), Vicodin, methyltestosterone, and a vitamin B12 injection.  (*Id.*)  Plaintiff stated her FM was flaring up so she increased her Vicodin intake.  Plaintiff explained that she tried Cymbalta and Lyrica in the past but had not tolerated them well.  (*Id.*)  Plaintiff also stated her depression was better despite her ongoing divorce.  (*Id.*)  Dr. Houtz noted multiple FM tender points on exam.  She recommended a trial of amitriptyline and

increased activity.  (AR 327.)  In May 2011, Plaintiff presented with lower back pain and depression with increased tearfulness relating to money and boyfriend stressors.  (AR 325.)  She reported sleeping better since starting amitriptyline.  (*Id.*)  Upon physical examination, she was able to bend at the waist with fingertips six inches from the floor, experienced some tenderness with lateral flexion, was nontender over her lumbar spine, had some tenderness over her bilateral SI joints, and had a negative straight leg raise test bilaterally.  (*Id.*)

### 2. 2012

On May 17, 2012, Plaintiff presented to Pacific Medical Center in Washington and established treatment with Dr. Shailaja Reddy.  (AR 348.)  Plaintiff had not seen her previous physician, Dr. Houtz, for the past year as she lost her insurance and had just recently become reinsured.  (*Id.*)  Plaintiff reported she had seen several rheumatologists since being diagnosed with FM, most recently Dr. Hollman two years prior.  (*Id.*)  She had been prescribed Cymbalta, which made her mood worse and did not help her FM.  Instead, she took Vicodin intermittently for pain.  (*Id.*)  In addition, Plaintiff intermittently used marijuana for both recreation and FM pain.  (AR 349.)  Her FM pain was primarily in her neck, shoulders, arms, low back, and legs.  The pain was usually accompanied by fatigue and difficulty sleeping.  (AR 348.)  Plaintiff was still taking Mirapex for RLS.  (AR 349.)  Upon physical examination, Plaintiff exhibited tender points in posterior neck and upper thoracic areas.  (*Id.*)  Dr. Reddy referred Plaintiff to rheumatology, suggested Lyrica, and explained the importance of exercise for Plaintiff's FM.  (AR 350.)  Dr. Reddy denied Plaintiff a prescription for Vicodin, explaining that she did not advocate the use of chronic narcotics for FM.  (*Id.*)  In June 2012, Plaintiff complained of continued achiness in her neck, low back, hands, and legs, as well as ongoing fatigue.  (AR 347.)  Dr. Reddy assessed vitamin D and B12 deficiencies and osteopenia.  (AR 348.)

1    In June 2012, Plaintiff saw rheumatologist Mary Wemple, M.D. for a FM

2    management consultation upon Dr. Reddy's referral.  (AR 343.)  Plaintiff reported her

3    FM symptoms had been additive over the years.  (*Id.*)  Plaintiff reported that her whole

4    body was tender and her arms hurt when her cat walked on her.  (*Id.*)  Her primary areas

5    of pain included her neck, lower back, hips, and legs.  (*Id.*)  Her neck pain was

6    intermittent, could be constant for several days, and was triggered by computer work and

7    watching television.  (*Id.*)  Plaintiff previously went to a pain clinic in Everett,

8    Washington, where an injection helped, but massage did not as it was painful.  (*Id.*)

9    Plaintiff experienced constant pain across her low back, for which she had received

10   acupuncture and lidocaine injections with temporary relief, and for which she used a

11   TENS unit for pain relief.  (*Id.*)  Plaintiff also had lateral hip pain and experienced pain

12   when going from a squatting to standing.  (*Id.*)  Her legs ached all the time as if she had

13   run a marathon.  (*Id.*)  She occasionally felt weak while getting out of a chair, climbing

14   stairs, and walking.  (*Id.*)  She described her RLS as a "sick feeling" with spasms in her

15   low back and jerking in her legs.  (*Id.*)  She took Mirapex once per day and, on rare

16   occasion, twice per day.  (*Id.*)  She took six ibuprofen per day without much relief.  (*Id.*)

17   She found periodic Vicodin helpful.  (*Id.*)  On physical examination, Plaintiff's hips

18   showed excellent range of motion and strength without pain.  (*Id.*)  Plaintiff had less than

19   eleven out of eighteen FM tender points.  (*Id.*)  Dr. Wemple diagnosed FM with

20   superimposed chronic myofascial neck and low back pain and degenerative disease,

21   trochanteric bursitis, and sleep disturbance.  (AR 346.)  Dr. Wemple's recommendations

22   included: MRIs of the cervical and lumbar spines; referral to physical therapy; referral to

23   pain clinic; consider trial of nortryptiline for sleep as sleep management was essential for

24   management of FM pain; exercise encouraged; and consider Lyrica for leg pain if

25   nortryptiline was not successful.  (AR 346-47.)

26        In September 2012, Plaintiff saw Dr. Melissa Molsee of Pacific Medical Center to

27   discuss FM, whole skin burning and stinging, and to ask for a prescription for narcotics.

28

(AR 342.)  Dr. Molsee noted Plaintiff had not followed up with Dr. Reddy, her primary care provider, after her visit with Dr. Wemple.  (*Id.*)  Plaintiff declined a referral to dermatology for her skin pain.  (*Id.*)  Dr. Molsee refused to prescribe narcotics and instructed Plaintiff to follow up with Dr. Reddy.  (*Id.*)

In October, Plaintiff presented to Dr. Dana A. Swenson of Pacific Medical Center. (AR 341.)  Plaintiff complained of diffuse body pain.  (*Id.*)  She had pain in her shoulder, neck, arm, legs, slept poorly, and continued to have a burning sensation on her skin.  (*Id.*) Plaintiff had started nortriptyline but was bothered by daytime somnolence. (*Id.*)  She was afraid to try Lyrica, which had been suggested by Dr. Wemple.  (*Id.*)  Plaintiff stated she walked fifteen to twenty minutes per day for exercise.  (*Id.*)  Dr. Swenson recommended that Plaintiff see Dr. Neiman, a rheumatologist she had seen a few years prior.  (*Id.*)  Dr. Swenson also recommended that Plaintiff restart bisphosphonate for her osteoporosis, for which she had taken no medication for the past year.  (*Id.*)

### 3.   2013

In January 2013, Plaintiff consulted with Dr. Neiman, who noted he was seeing her after a three year absence.  (AR 428.)  Plaintiff reported a burning sensation in her skin at night; not sleeping well; increasing pains in her neck, hips, and legs; and chronic pain in her knees.  (*Id.*)  Plaintiff had discontinued Mirapex for RLS due to nausea.  (*Id.*) Plaintiff was taking Fosamax (bisphosphonate) for osteoporosis.  (*Id.*)  Upon examination, Dr. Neiman noted that Plaintiff had a history of FM "though examination today was benign."  (AR 429.)  He was unable to determine the cause of Plaintiff's nerve pain.  (*Id.*)  He opined that Plaintiff's absorption of Fosamax could be poor due to her previous gastric bypass surgery and suggested her primary physician consider Reclast IV. (*Id.*)  He prescribed Plaintiff sixty Vicodin and warned her to take them sparingly.  (*Id.*) He also recommended that Plaintiff change her multivitamin as her paresthesias (tingling and burning sensations) and RLS could be due to poor absorption of trace minerals.  (*Id.*)

In May 2013, Plaintiff returned to Pacific Medical Center and saw Dr. Kathryn Pearson. (AR 375.) Plaintiff requested a renewal of her handicapped parking permit as her hip pain made it difficult to walk at times. (*Id.*) Plaintiff described total body pain, but stated her hip and lower back symptoms were the worst. (*Id.*) Her RLS symptoms had not improved with Mirapex and nortriptyline; she had not seen a neurologist for this condition. (*Id.*) Plaintiff stated she had fallen onto her left shoulder in January 2013 while in Arizona. (*Id.*) Her active problems included FM; osteopenia (for which she had been on Boniva for one year in 2011 and on Fosamax for two years); RLS; IBS; and neck pain. (*Id.*) The only abnormal finding on Plaintiff's musculoskeletal exam was a prominent tender nodule over Plaintiff's left clavicle in her shoulder. (AR 376.) Dr. Pearson referred Plaintiff to neurology for her paresthesia and RLS, and to an orthopedist for her shoulder. (*Id.*) Dr. Pearson also queried whether Plaintiff had a vitamin deficiency due to her gastric bypass and not taking her medications regularly. (*Id.*)

In June 2013, Plaintiff consulted with Dr. Robin Fuchs of ProOrtho regarding a fracture of her left clavicle, which she stated she had sustained after falling out of bed in a motor home in January 2013 in California.[5] (AR 418.) Dr. Fuchs discussed surgical and non-surgical options and opined that surgery would be challenging and could result in further complications. (AR 419.) Dr. Fuchs also noted Plaintiff's shoulder appeared quite functional. (*Id.*)

Plaintiff returned to Dr. Neiman in June 2013. (AR 452.) He initiated weekly vitamin B12 injections and prescribed sixty pills of Vicodin with two refills. (*Id.*) In December 2013, Plaintiff saw Dr. Neiman again and reported having had one week of severe back pain. (AR 442.) Plaintiff had decided to wait until spring to start Reclast, but was back on Mirapex as Requip had not helped her RLS. (*Id.*) Plaintiff's other problems included IBS, incontinence, and depression. (*Id.*) Dr. Neiman noted on

---

[5] Plaintiff was in Yuma, Arizona in February and March 2013 and planned to drive back and return to Enumclaw, Washington in May 2013. (AR 423.)

physical exam that Plaintiff was tender to palpation fairly diffusely. (*Id.*) He also opined that Plaintiff's basic problem appeared to be chronic pain due to FM. (*Id.*) He refilled her Vicodin, advised her to take one pill twice per day, noted she would be rechecked when she returned from a California-Arizona sojourn for the winter, and would start Reclast in the spring. (*Id.*)

### 4. 2014

In July and August 2014, Plaintiff called Dr. Neiman's office for a medication refill. (AR 441.) Dr. Neiman declined to fill the prescription as Plaintiff had not been seen since December 2013. (*Id.*)

On July 26, 2014, Plaintiff was seen at Doctors Express in Oceanside, California. (AR 473.) She described her history of FM and reported pain in her lower back and legs with a severity of seven out of ten. (*Id.*) She requested a prescription for Vicodin and gabapentin to get her through her trip back to Washington. (*Id.*) Plaintiff exhibited spasm and tenderness of her paraspinal muscles. (AR 469.) She was provided with the requested prescriptions with no refills and advised to follow up with her primary physician in two weeks. (*Id.*) On August 13, 2014, Plaintiff again presented to Doctors Express with complaints of intermittent back pain, eight on a scale of ten, made worse with movement. (AR 460.) She explained she would be trying to go back to Washington soon but was in a lot of pain and was managing her pain with Norco (Vicodin). (*Id.*)

In October 2014, Plaintiff visited Associated Gastro of Northwest in Kirkland, Washington regarding iron deficiency anemia. (AR 505.) She reported a history of FM for which she had been taking NSAID (non-steroidal anti-inflammatory drug) until recently. Plaintiff's medication list included: cyanocobalamin (vitamin B12) injectable, escitalopram (Lexapro), gabapentin, hydrocodone-acetaminophen (Vicodin), omeprazole (stomach acid reducer), pramipexole (Mirepex), and slow release iron. (AR 506.) Plaintiff was scheduled for an upper endoscopy and was instructed to limit alcohol intake to five drinks per week and to avoid NSAID use. (*Id.*) A biopsy showed no diagnostic

abnormality in Plaintiff's small intestine and reactive gastropathy in Plaintiff's stomach. (AR 497.)

In November 2014, Plaintiff saw Dr. Bryan MacWilliams in the emergency room at Evergreen Health. (AR 499.) She had not taken Mirapex and was starting to have spasms in her lower back causing severe pain. (*Id.*) Plaintiff appeared to be in pain with spasmodic movements and leg jerking; her lumbar musculature was moderately tender on exam. (AR 501.) Dr. MacWilliams prescribed Mirapex as requested. (AR 499.)

In December 2014, a bone densitometry performed on Plaintiff showed osteoporosis. (AR 486-87.)

**B.     Examining Physicians**

**1.     Hayden Hamilton, M.D. (May 2013)**

On May 23, 2013, Plaintiff received an evaluation from Hayden Hamilton, M.D., in Federal Way, Washington. (AR 367.) Her chief complaints were back pain and FM. (*Id.*) Plaintiff explained that she had experienced twenty years of spontaneous back pain, which she believed was secondary to previous obesity. (*Id.*) She asserted various pain symptoms but most consistently experienced a constant stabbing pain without any radiating symptoms. (*Id.*) Plaintiff also stated she had FM for approximately ten years which involved her entire body but most significantly, her abdomen and lower extremities. (*Id.*) Plaintiff had an aching quality throughout her body but experienced a throbbing sensation during the examination. (*Id.*) Plaintiff stated she experienced an exacerbation of her symptoms in cold weather and experienced symptom improvement in warmer weather climates. (AR 368.) Plaintiff stated she lived with her daughter and was independent with hygiene, dressing, and cooking. (*Id.*) However, Plaintiff noted difficulty on bad days due to pain, and her daughter assisted with chores around the house. (*Id.*)

Dr. Hamilton found Plaintiff was tender to touch with light palpation in the eighteen areas consistent with FM trigger points. (AR 370.) Dr. Hamilton listed the

following diagnoses: FM; back pain, possibly secondary to FM; impaired balance with unclear etiology; and impaired sensation with unclear etiology. (*Id.*) Dr. Hamilton opined that Plaintiff experienced a significant amount of pain secondary to her FM and this seemed to limit her motor strength without any true deficits. (*Id.*) Dr. Hamilton found no limitations in Plaintiff's ability to stand, walk, and sit in an eight-hour workday with normal breaks. (*Id.*) He further found Plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently, and she should avoid climbing ladders and scaffolding due to her impairment in balance. (AR 371.) Otherwise, Plaintiff had no limitations on postural activities, or manipulative activities such as handling, reaching, fingering, and feeling. (*Id.*) However, Plaintiff should avoid working around heights, heavy machinery, extremes of temperature, and chemicals. (*Id.*) MRIs conducted on May 23, 2013 showed mild degenerative changes of the thoracic spine and no significant lumbar spine abnormality. (AR 365.)

### 2. Enid Grifin, Psy.D. (May 2013)

On May 28, 2013, Plaintiff underwent psychological evaluation with Enid Griffin, Psy.D. (AR 410.) Plaintiff told Dr. Griffin that she left her job as an office manager in 2011 because of "stupidity, I met a man online and left my husband of 30 something years." (AR 411.) She had lived with her daughter since 2011 and had been in a relationship with her current boyfriend for two years. (*Id.*) Plaintiff states she had sleep problems due to pain and slept between five to six hours per night. (AR 412.) She was able to take care of her hygiene and laundry. (*Id.*) Sometimes she assisted her daughter with cooking. (*Id.*) She socialized with her boyfriend during the weekends. (*Id.*) Plaintiff explained she woke up around 3:00 a.m., played "Mafia Wars" online for a while, and then she got back up around 6:00 or 6:30 a.m. and continued to play "Mafia Wars" during the day. (*Id.*) On the weekends, she and her boyfriend worked in the yard, went shopping, watched television, and soaked in the hot tub. (*Id.*)

Dr. Griffin found that Plaintiff's reported symptoms met the criteria for Mood Disorder, Not Otherwise Specified ("NOS"), and Anxiety Disorder, NOS. (AR 413.) She recommended that Plaintiff receive intensive, consistent therapy. (*Id.*) Overall, from a mental health standpoint, Dr. Griffin found it likely Plaintiff would be able to engage in training and part-time work once she engaged in therapeutic and psychiatric interventions and her mental health symptoms had decreased. (*Id.*) Dr. Griffin opined Plaintiff would likely be able to return to work within twelve months, but noted Plaintiff's reported health and pain issues could impact her ability to work and function. (*Id.*)

### C. Nonexamining Physicians

State agency physicians reviewed Plaintiff's medical records at both the initial and reconsideration levels. At the initial level, Dr. Christmas Covell, Ph.D. assessed Plaintiff's mental condition and determined Plaintiff to have mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (AR 75.) Dr. Covell clarified:

> Claimant is able to carry out a normal work week engaged in simple as well as complex routines. She is able to sustain concentration, pace and persistence when engaged in activities which are enjoyable to her, such as video games and travel. She would not be precluded from sustaining a normal work week due to her depression or anxiety symptoms [even though they] are mild.

(AR 79.) At the reconsideration level, Dr. Dan Donahue, Ph.D. concurred with Dr. Covell's mental health assessment. (AR 90.) Dr. Gordon Hale, M.D. found the medical evidence supported the following physical residual functional capacity: lift and carry fifty pounds occasionally and twenty-five pounds frequently; stand, walk, and sit more than six hours on a sustained basis in an eight-hour workday; frequently stoop, kneel, crouch, and crawl; occasionally climb ladders, ropes, and scaffolds; and avoid concentrated exposure to extreme cold, extreme heat, vibration, and hazards. (AR 92-93.)

### D.     Self-Reporting and Third-Party Evidence

In a function report dated January 14, 2013, Plaintiff described how her condition limits her ability to work as follows: "In pain all the time, can't sit or stand for too long, memory issues so forget what is due and timelines. Get sick from medications during day and fall asleep because I am so tired." (AR 225.) On October 7, 2013, Plaintiff provided similar information on her disability report. (AR 244.)

In a letter dated June 1, 2015, Plaintiff's boyfriend, Dennis Graham, stated he had known Plaintiff since May 2011 and had lived with her for three of those years. (AR 262.) Thus, he "had ample opportunity to observe her in every situation." (*Id.*) He felt she was unable to work due to her occasional inability to recall discussions, her need to rest and nap every morning and every afternoon, and her inability to walk, stand, or sit for a long time. (*Id.*)

### III.    THE ADMINISTRATIVE HEARING

### A.     Plaintiff's Testimony

At her June 8, 2015 administrative hearing, Plaintiff testified she stopped working in March 2011 because she left her husband and moved out of state. (AR 41.) She tried to find employment in Washington, but was unable to do so due to issues with her memory and pain levels. (*Id.*) She tried to find work during the two years she collected unemployment benefits, from 2011 to 2013 and eventually exhausted her benefits. (*Id.*) When asked how she reconciled collecting unemployment, which required her to certify she was actively looking for work, while at the same time alleging she was totally disabled as she was unable to find any jobs that could accommodate her condition. (AR 43-44.) Plaintiff testified that she met her boyfriend at a dance in May 2011 and that they were in the process of moving to California. (*Id.* at 44.) She stated he had a motorhome and took her "where the warmth is." (*Id.* at 45.) She testified she was able to cook, shop for groceries, do laundry, and drive, but did not drive in the afternoons as she becomes

"spacey" and sleepy after taking gabapentin and Mirapex between noon and 1:00 p.m. (*Id.* at 46.) She used to swim for exercise almost every day, but could now only manage once or twice per week, and could walk much less than she used to because "it's too hard on me to do that now." (*Id.* at 47.) If she walked more than a block, she started limping badly because of her hips and knees, and experienced excruciating pain. (*Id.* at 48.) At the time of the hearing, Plaintiff's medication included Mirapex three times per day, Lexapro at night, gabapentin three times per day, hydrocodone at night, Acyclovir once a week, pregabalin (Lyrica), and a B12 injection every other week. (*Id.* at 48-49.) She testified Mirapex helped her, and although Lexapro helped her depression, her dosage needed to be increased and she needed to attend counseling because "I get thoughts I should not be getting." (*Id.* at 49.) She played "Mafia Wars," an online role playing game, with "people all over the place." (*Id.* at 50-51.) She used to play nonstop, but realized it was too addictive so limited her play to half an hour per day. (*Id.* at 52.) She testified she sweeps the kitchen floor, but does not vacuum or dust. (*Id.*)

Plaintiff stated she is unable to work because she cannot sit or stand for long periods of time, her fatigue level requires her to lie down and rest or sleep for hours during the day, and recall of words is difficult. (*Id.* at 52-53.) Her FM has gotten worse over time, and she recalled that while in Alaska, she had started getting poor job reviews which had never occurred before. (*Id.* at 53.) She stated her employer's refusal to give her a job recommendation did not help her job search as she had worked for that employer for twenty-five years. (*Id.*) Plaintiff testified she slept six to seven hours per night and took a two hour nap during the day because "I am just so tired I just fall asleep." (*Id.* at 57.) She stated Dr. Neiman had told her there was nothing that could be done about the pins and needles sensations she experienced every night. (*Id.* at 58.) Her boyfriend helped her out of her chair often, and had to help her out of the car. (Id. at 59.) She testified she could lift and carry ten pounds for a short distance. (*Id.* at 60.) She concluded by stating she gets "spacey" and was feeling that way at the hearing. (*Id.*)

## B.  Vocational Expert's Testimony

The vocational expert ("VE"), Paul Prachyl, Ph.D., testified Plaintiff's previous work consisted of the sedentary position of "bookkeeper." (*Id.* at 63.)  The ALJ set forth the following hypothetical:

> [A]ssume an individual with the past work you've described and the age and education of the claimant. I'd ask you to further assume that this individual's able to work at the medium exertional level, except this individual would be able to unlimitedly climb ramps and stairs[;] [o]ccasionally climb ladders, ropes, and scaffolds[;] [u]nlimitedly balance[;] frequently stoop, kneel, crouch, and crawl. This individual would need to avoid concentrated exposure to extreme cold and heat, vibrations and hazards such as moving machinery and unprotected heights.

(*Id.*)  The VE testified such an individual could perform both Plaintiff's past work as well as other work, including industrial cleaner, hand packager, and grinding and polishing laborer.  (*Id.* at 63-64.)  Plaintiff's past work would allow alternating between sitting and standing; the other work, as all work in the medium occupational base, would require standing and walking the whole day.  (*Id.* at 64.) With respect to how much time an individual could take off before she would no longer be able to sustain employment, the VE testified it varies from employer to employer, but typically a deficit in production of ten percent would compel a supervisor to intervene, attempt remediation and, if unsuccessful, find a replacement. (*Id.* at 65.) The VE stated an employer would have no tolerance for taking extra breaks, and the tolerance for absenteeism was approximately one day per month. (*Id.* at 66.)

## IV.  THE ALJ'S DECISION

After considering the record, ALJ Sloan made the following findings:

. . . .

> 2.  The claimant has not engaged in substantial gainful activity since March 16, 2012, the alleged onset date [citation omitted].

3.      The claimant has the following severe impairments: fibromyalgia, degenerative disc disease of the lumbar spine and cervical spine [citation omitted].[6]

. . . .

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in [the Social Security regulations].

. . . .

5.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) except she can unlimitedly climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; unlimitedly balance; frequently stoop, kneel, crouch, and crawl; avoid concentrated exposure to extreme cold and heat, vibration and hazards such as moving machinery and unprotected heights.

. . . .

6.      The claimant is capable of performing past relevant work as a bookkeeper, DOT 210.382-014, sedentary work with an SVP of 6.[7]  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity [citation omitted].

. . . .

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills [citation omitted].

. . . .

---

[6] The ALJ determined Plaintiff's mood disorder, anxiety disorder, alcohol abuse, depression, conjunctivitis, iron deficiency, anemia, osteopenia (osteoporosis), IBS, and history of left distal clavicle fracture were nonsevere.  (AR 20-21.)

[7] Specific Vocational Preparation ("SVP") indicates "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  Dictionary of Occupational Titles, app. C, available at 1991 WL 688702.  A SVP of 6 requires "over 1 year up to and including 2 years."  *Id.*

10.    In the alternative, considering the claimant's age, education, work experience, and residual functional capacity, there are other jobs that exist in significant numbers in the national economy that the claimant can also perform [citations omitted]

. . . .

11.    The claimant has not been under a disability, as defined in the Social Security Act, from March 16, 2012, through the date of this decision [citation omitted].

(*Id.* at 20-30.)

## V.    STANDARD OF REVIEW

### A.    Standard of Review of Magistrate Judge's Report

The district judge must "make a *de novo* determination of those portions of the report . . . to which objection is made," and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b). The district court need not review *de novo* those portions of a Report to which neither party objects. *See Wang v. Masaitis*, 416 F.3d 992, 1000 n.13 (9th Cir. 2005); *U.S. v. Reyna-Tapia*, 328 F.3d 1114, 1121-22 (9th Cir. 2003) (*en banc*). On February 14, 2018, Plaintiff filed Objections to the Report. (ECF No. 22.) Therefore, the Court makes a *de novo* review of the portions of the Report to which Plaintiff objects.

### B.    Standard of Review of Commissioner's Final Agency Decision

A district court has jurisdiction to review final decisions of the Commissioner of Social Security. 42 U.S.C. § 405(g). Section 405(g) permits the court to enter a judgment affirming, modifying, or reversing the Commissioner's final decision. *Id.* The matter may also be remanded to the Commissioner for further proceedings. *Id.* The scope of judicial review is limited, and the Commissioner's final decision should not be disturbed unless it is "not supported by substantial evidence or it is based on legal error." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (internal quotations and citations omitted); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (court "will disturb

the denial of benefits only if the decision contains legal error or is not supported by substantial evidence.") (internal marks omitted). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009) (internal quotations and citations omitted). The evidence must be "more than a mere scintilla," but may be less than a preponderance. *Id.* Even when the evidence is susceptible to more than one rational interpretation, the court must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record. *Tommasetti*, 533 F.3d at 1038. Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that "the ALJ's error was 'inconsequential to the ultimate nondisability determination.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006) (quoting *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1055-56 (9th Cir. 2006)).

For purposes of the Social Security Act, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "This provision establishes a severity and durational requirement for recognition of disabilities under the Act that accords with the remedial purpose of the Act to protect workers whose disability prevents them from earning a living for a significant period of time." *Flaten v. Sec. of Health and Human Servs.*, 44 F.3d 1453, 1459 (9th Cir. 1995).

## VI. DISCUSSION

### A. Plaintiff's Objections

Plaintiff asserts the following specific objections to the Report: (1) FM must be addressed under SSR 12-2p, (ECF No. 22 at 4); (2) SSR 12-2p requires Plaintiff's

subjective statements and her treating specialists be addressed, (*Id.* at 5); (3) The ALJ cannot use a nonexamining physician's opinion to evaluate FM under SSR 12-2p, (*Id.* at 8); and (4) SSR 12-2p and SSR 82-62 require that the ALJ address Plaintiff's FM and mental limitations when determining past work, (*Id.* at 11.) The Court will address each objection in turn.

### 1. Fibromyalgia Analysis Under SSR 12-2p

Plaintiff argues that the Magistrate erred when opining that SSR 12-2p cannot be used to find disability. (*Id.* at 4 (citing ECF No. 21 at 22).) However, Plaintiff misreports the Magistrate's opinion. The Magistrate indeed recognized that under SSR 12-2p "fibromyalgia can be the basis for a finding of disability, [but] it is not automatically so." (ECF No. 21 at 22;); *see* SSR 12-2p, 2012 WL 3104869, at *2 (July 25, 2012) ("FM can be the basis for a finding of disability."). Nonetheless, Plaintiff contends that SSR 12-2p provides for a presumptive disability. (ECF No. 22 at 5.)

SSP 12-2p makes clear that a person may have a medically determinable impairment ("MDI") of FM without being presumptively disabled. *See* SSR 12-2p at *2 ("As with any claim for disability benefits, before we find that a person with an MDI of FM is disabled, we must ensure there is sufficient objective evidence to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity."). Though related, the notion of having an **MDI** of FM versus having a compensable **disability** are distinct concepts. *See id.* (emphasis added). An MDI is established by providing evidence from an acceptable medical source. SSR 12-2p at *2 (citing 20 C.F.R. §§ 404.1513(a), 416.913(a)). Once the SSA determines that a person has an MDI of FM, it will conduct a five-step sequential evaluation process to establish whether the person is disabled.[8] SSR

---

[8] At step one, the SSA considers whether a person with an MDI or FM is engaged in substantial gainful work activity. SSR 12-2p at *5. If she is engaged in such activity, she is not disabled. *Id.* At step two,

12-2p at *5. The sequential evaluation seeks to determine whether the person's MDI of FM equates to the requirements of a listed impairment,[9] and whether that MDI of FM disables the person from doing "her past relevant work or other work that exists in significant numbers in the national economy." SSR 12-2p at *5.

Plaintiff conflates the idea of having an MDI of FM with having a compensable disability. These are distinct concepts. *See* SSR 12-2p. Plaintiff correctly asserts that SSR 12-2p provides a foundation to find disability. However, she fails to recognize the fact that an MDI of FM under SSR 12-2p only gives rise to a compensable disability after it has satisfied the five-step sequential evaluation. While SSR 12-2p provides the foundation for establishing a compensable disability predicated on an FM diagnosis, it does not provide for a presumptive finding of disability as Plaintiff asserts.[10] *See* SSR 12-2p at *2. Thus, Plaintiff has shown no error with respect to the ALJ's application of SSR 12-2p, nor the Magistrate's analysis with respect to this issue.

## 2. Plaintiff's Subjective Statements under SSR 12-2p

Plaintiff argues that the Magistrate improperly upheld the ALJ's finding that Plaintiff's subjective symptom testimony was not credible.[11]

---

the SSA considers whether the MDI of FM is "severe." *Id.* "If [claimant's] pain or other symptoms cause a limitation or restriction that has more than a minimal effect on the ability to perform basic work activities, [the SSA] will find that the person has a severe impairment(s)." *Id.* At step three, the SSA will either (1) consider whether claimant's MDI of FM medically equates to the criteria of any of the listings in the Listing of Impairments under 20 C.F.R. pt. 404, subpt. P, app. 1, or (2) make an assessment of her Residual Functional Capacity ("RFC"). *Id.* at *6. At the fourth step, the SSA determines whether claimant is capable of doing any past relevant work based on her RFC. *Id.* Finally, if it finds that claimant is not able to do past relevant work, the SSA proceeds to step five to determine whether she can do any other work. *Id.*

[9] FM is not a listed impairment in the Listing of Impairments found at 20 C.F.R. pt. 404, subpt. P, app. 1. SSR 12-2p at *6.

[10] *See* (ECF No. 22 at 5) ("The [SSA] states a finding of [d]isability is based on a[n] [MDI] . . . SSR 12-2p holds [FM is] a[n] [MDI] . . . As such, SSR 12-2p provides a foundation to find disability and presumptive disability.").

[11] Specifically, Plaintiff argues that "[t]he ALJ may not comb through the records for inconsistenc[ies] to negate a client's statement as to pain." (ECF No. 22 at 6.) Plaintiff further states, "the fact she can

The ALJ is tasked with determining credibility, resolving conflicts in the testimony, and resolving ambiguities in the record. *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014) (internal citation omitted). In deciding whether to accept a claimant's subjective pain or symptom testimony, an ALJ must perform a two-step analysis. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). First, the ALJ must assess "whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). Second, if the first test is met and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reason for doing so. *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen*, 80 F.3d at 1283-84.

Here, the ALJ found the Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (ECF No. 21 at 24; AR 25.) The ALJ did not address any affirmative evidence of malingering. *See Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999) (without affirmative evidence of malingering, the Commission must provide clear and convincing reasons for rejecting claimant's testimony). Therefore, since the first step has been met, the ALJ must present specific, clear and convincing findings to reject Plaintiff's subjective pain testimony. *See Smolen*, 80 F.3d at 1281.

General findings are not sufficient; "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015). The decision "must contain *specific reasons* for the finding on credibility, supported by the evidence in the case record, and must be

---

drive does not discredit her statements as to pain and her inability to function. Her decision to leave the state does not discredit her nor does the fact she forgot to take vitamins or missed a doctor's appointment." (*Id*. at 7.)

sufficiently specific to make clear to . . . any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.*; *see Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) ("[An ALJ] must state which pain testimony is not credible and what evidence suggests the claimant[] [is] not credible.").

Here, the ALJ outlined eight justifications for discrediting Plaintiff's testimony, including Plaintiff's (i) receipt of unemployment benefits; (ii) work history; (iii) reason for leaving her job; (iv) daily activities; (v) noncompliance with treatment; (vi) inconsistent statements; (vii) ability to drive; and (viii) objective medical evidence. In his Report, the Magistrate addressed each of the ALJ's justifications. This Court will review the Magistrate's analysis of each justification in turn.

*i.    Unemployment Benefits*

The Magistrate found that Plaintiff's receipt of unemployment benefits was not a clear and convincing reason to discount her symptom testimony. (ECF No. 21 at 25.) The receipt of unemployment benefits after the alleged onset date of disability can "cast doubt on a claim of disability, as it shows that an applicant holds himself out as capable of working." *Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014). However, a claimant's receipt of unemployment benefits does not necessarily constitute a legally sufficient reason for an adverse credibility determination when the record "does not establish whether [the claimant] held himself out as available for full-time or part-time work." *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1161-62 (9th Cir. 2008).

Here, Plaintiff contends she held herself out as disabled to prospective employers. Specifically, she testified to informing potential employers about her limitations as to sitting and standing. (AR 43-44.) The record does not establish whether Plaintiff claimed she was available for full-time or part-time work. The administrative record does not contain Plaintiff's unemployment application and the specific certifications made therein. Accordingly, the Court finds that the evidence in the record that Plaintiff was receiving unemployment benefits from 2011 through the second quarter of 2013 did

not give rise to a legally sufficient reason on which the ALJ could rely in support of an adverse credibility determination. *See e.g., Macias v. Colvin*, No. CV 15-3711 PLA, 2016 WL 1091043, at \*5 (C.D. Cal. Mar. 21, 2016) (claimant's receipt of unemployment benefits was not clear and convincing reason for ALJ's adverse credibility determination where the record did not indicate whether claimant held himself out as available for full-time or part-time work); *Plummer v. Colvin*, No. CV-13-08282-PCT-BSB, 2014 WL 7150682, at \*16 (D. Ariz. Dec. 16, 2014) (same, where the record did not contain the unemployment benefits application); *see also Wood v. Colvin*, No. 2:13-CV-00190-JTR, 2014 WL 4407719, at \*9 (E.D. Wash. Sept. 8, 2014). Accordingly, the Court agrees with the Magistrate's finding that Plaintiff's receipt of unemployment benefits is not a clear and convincing reason to discount her symptom testimony.

### ii.       Work History

The Magistrate determined that Plaintiff's ability to work until 2011 notwithstanding her FM diagnosis in 2008 or 2009 to be a clear and convincing reason to discredit Plaintiff's testimony. (ECF No. 21 at 26.) The Plaintiff does not specifically object to the ALJ's consideration of her work record or the Magistrates analysis thereof.

An ALJ may properly consider a claimant's work record when weighing a claimant's credibility. *See Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ observed that Plaintiff was not previously prevented from working despite the presence of her alleged impairment at approximately the same level of severity. The Court agrees with the Magistrate that Plaintiff's work history is within the purview of the ALJ's consideration when making a credibility determination. Thus, the Court finds the ALJ's adverse credibility determination based on Plaintiff's work history to be clear and convincing.

### iii.       Reason for Leaving Previous Job

Relying on *Bruton*, the Magistrate found that the ALJ did not err in considering Plaintiff's reason for leaving her last place of employment when evaluating her

credibility. (ECF No. 21 at 26 (citing *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001)).

An ALJ may consider why a claimant left her last place of employment when making a credibility determination. *See Bruton*, 268 F.3d at 828 (finding the ALJ could properly discount the claimant's pain testimony as the claimant left his job because he was laid off, rather than because he was injured). However, making a credibility determination based on a claimant's reason for leaving her job calls for a fact-specific review. *See, e.g.*, *Shehan v. Astrue*, No. EDCV 08-01302(MLG), 2009 WL 2524573, at *3 (C.D. Cal. Aug. 17, 2009) (comparing the facts in *Bruton* to the facts at bar to determine whether an adverse credibility determination based on claimant's reason for leaving her job was proper); *Lessley v. Colvin*, 2015 WL 10710837, at *7 (D. Nev. Nov. 13, 2015) (same); *Thomas v. Colvin*, No. CV 15-01451-RAO, 2016 WL 1733418, at *5 (C.D. Cal. Apr. 29, 2016) (same).

In *Bruton*, the claimant was injured on the job in March 1993 and continued working until he was laid off on April 6, 1993. 268 F.3d at 826. Bruton then applied for DIB on June 10, 1993, alleging disability with an onset date the same as his lay-off date (April 6, 1993). *Id.* Bruton claimed that he had stopped working for medical reasons, but he waited nine months to seek medical treatment, and he told his doctors that he left his job because he was laid off. *Id.*

Here, in contrast, Plaintiff never claimed her termination was related to her disability. Instead, she admittedly left her job because of "stupidity, [after she] met a man online and left [her] husband of 30 something years." (AR at 41, 411.) Unlike *Bruton*, the record does not support the inference that Plaintiff sought disability benefits simply because she was no longer employed. In fact, she stopped working in March 2011, (*see* AR at 41,) approximately one year before the alleged onset of her disability on March 16, 2012. (*Id.* at 193.) The gap between Plaintiff's last date of employment and the alleged onset of her disability lessens the impact of her admission that she originally

stopped working for non-disability reasons. *See Thomas*, 2016 WL 1733418, at *5. In fact, her candidness may reflect a propensity for truthfulness, which could cut in favor of her credibility. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (the ALJ may use ordinary techniques of credibility evaluation, such as considering the claimant's reputation for truthfulness and any inconsistent statements in her testimony) (internal quotation and citation omitted). Thus, the Court has reviewed the Magistrate's reasons for supporting the ALJ's determination, but, on balance, finds that discrediting Plaintiff's subjective testimony based on her reason for leaving past employment is not clear and convincing.

### iv.     Daily Activities

The Magistrate determined that Plaintiff's reported daily activities do not provide a clear and convincing reason to discount her symptom testimony. (ECF No. 21 at 27.)

The ALJ may consider the claimant's daily activities in making a credibility determination. *See, e.g.*, *Diedrich v. Berryhill*, 874 F.3d 634, 648 (9th Cir. 2017); *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002); *see also* 20 C.F.R. § 404.1529(c)(3)(i) (claimant's daily activities are relevant to evaluating symptoms). Yet, "[o]ne does not need to be 'utterly incapacitated' in order to be disabled." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) (citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). In fact, "many home activities are not easily transferable to what may be the more grueling environment of the workplace." *Fair*, 885 F.2d at 603. Only if a claimant's level of activities is inconsistent with her claimed limitations would activities of daily living have any bearing on the claimant's credibility. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

The ALJ discussed several daily activities that purportedly undermine Plaintiff's credibility as to the extent of her restrictions, including: Plaintiff's personal care, use of the computer, yard work, household chores, shopping, driving, computer games, and reading. However, these activities are not readily "transferrable to a work environment."

*See Diedrich*, 874 F.3d at 643 (holding house chores, cooking, self-grooming, paying bills, writing checks, and caring for a cat, as well as shopping outside the home, are not similar to typical work responsibilities). Further, this Court takes note of Dennis Graham's testimony,[12] which asserts that Plaintiff requires an hour of rest every morning and a nap each afternoon. *See Fair*, 885 F.2d at 603 (opining that it might be impossible to take periodic rests in the work environment). This Court has reviewed the Magistrate's analysis and agrees that the ALJ did not provide clear and convincing reasons to discredit Plaintiff based on her daily activities.

### v. Noncompliance with Treatment Regimen

The Magistrate found that Plaintiff's failure to comply with treatment recommended by her doctors constitutes a clear and convincing reason for the ALJ to discount Plaintiff's testimony. The Plaintiff specifically objects to this rationale.[13] (*See* ECF No. 22 at 7.)

"Failure to follow prescribed treatment may 'cast doubt on the sincerity of the claimant's pain testimony.'" *Trevizo v. Berryhill*, 871 F.3d 664, 680 (9th Cir. 2017) (quoting *Fair*, 885 F.2d at 603). There may be a number of good reasons for not seeking treatment and/or not following a prescribed course of treatment. *Fair*, 885 F.2d at 603 (citing 20 C.F.R. § 404.1530(c); *Gallant v. Heckler*, 753 F.2d 1450, 1455 (9th Cir. 1984)). However, an unexplained or inadequately explained failure to seek treatment or follow a prescribed course of treatment, or a finding by the ALJ that the proffered reason is not believable, can undermine the plaintiff's subjective symptom testimony. *Fair*, 885

---

[12] Dennis Graham is Plaintiff's boyfriend. Mr. Graham provided testimony by way of a letter dated June 1, 2015. (AR at 262.)

[13] "The Magistrate holds[,] the ALJ can use . . . facts such as when Dr. Pe[a]rson[] questioned whether Lake might not be taking her vitamins regularly. Lake told her doctor she has been on her medication 'more steady lately[,]' . . . and the record shows she missed an appointment. Given Lake's medical record spanning over ten years[,] this is not evidence of noncompliance but 'cherry picking' through the records." (ECF No. 22 at 7 (relying on *Attmore v. Colvin*, 827 F.3d 872 (9th Cir. 2016).)

F.2d at 603; *but see Trevizo*, 871 F.3d at 680 (loss of insurance may be an adequate explanation for noncompliance, so too could the experience of adverse side effects, such as a rash, speculatively caused by prescribed medication).

The ALJ relied solely on Psychologist Dr. Griffin's notes when concluding that Plaintiff had not been fully compliant with her treatment.[14] (*See* AR 25.) The Magistrate provided a more detailed overview of Plaintiff's alleged noncompliance but, after a review of the administrative record, this Court departs from the Magistrate's conclusion.

First, the Magistrate refers to Dr. Pearson's examination, where the doctor queried whether Plaintiff's vitamin deficiency was related to a failure to take her medications regularly. (ECF No. 21 at 28 (citing AR 376).) However, the Magistrate does not take note of Plaintiff's prior examination with Dr. Neiman, who suggested that her deficiency might be attributed to poor absorption of Fosamax secondary to her gastric bypass surgery. Dr. Neiman suggested that Plaintiff speak with her primary care physician about switching to Reclast to resolve the absorption problem. Indeed, Plaintiff inquired about making this switch when she saw Dr. Pearson.[15] (AR 375.) Yet, no such change or discussion about the potential change in medication appears in Dr. Pearson's report. (*See* AR 375-76.)

Next, the Magistrate points to Plaintiff's statement to Dr. Griffin that she had been on her medications for "6 months, but not steady, more steady lately." (ECF No. 28 (citing AR 411).) This is the same report relied upon by the ALJ to discredit Plaintiff. (*See* AR 25.) However, the only medication specifically named by Dr. Griffin is the hydrocodone (Vicodin) prescribed by Dr. Neiman. (AR 411.) Yet, Dr. Neiman expressly instructed Plaintiff to use the prescribed Vicodin "sparingly." (AR 429.)

---

[14] Referring to Plaintiff, the ALJ said, "[s]he indicated she does not always take her medications, which suggests that her symptoms are not as severe as alleged." (AR 25 (citing AR 411).)

[15] The progress notes from Plaintiff's consultation with Dr. Pearson on May 24, 2013 reflect that Plaintiff "[a]lso has questions about her osteopenia, was on Fosamax but was told by rheumatologist Dr. Nieman that Reclast would be better for her, has questions about this." (AR 375.)

The Magistrate also notes an incident in which Plaintiff missed her Mirapex medication. (ECF No. 21 at 28 (citing AR 499).) After missing this dose of medication, Plaintiff presented to the emergency room, stating "her pain is severe" and that "she has had these sorts of pain before," but only when she misses her medicines. (AR 499.) The Court finds it difficult to arrive at the inference that because Plaintiff missed a dose of medication, her symptoms were not as severe as she alleges when the result was an emergency room visit to treat severe pain. Also, in the past, Plaintiff had discussed with Dr. Neiman her tendency to skip Mirapex because it induces nausea. (AR 428.) *See Fair*, 885 F.2d at 603 (adequately explained failures to comply with recommended treatment do not undermine a claimant's subjective testimony); *Burnell v. Sullivan*, 947 F.2d 341, 346-47 (9th Cir. 1991) (the ALJ may consider adverse side effects of medications); *see, e.g.*, *Trevizo*, 871 F.3d at 680 (holding that a single instance of noncompliance could not be counted against claimant when she skipped medication because she believed in caused a rash).

Finally, the Magistrate points to an occasion where Plaintiff failed to follow up with Dr. Reddy (her assigned primary care physician) after seeing Dr. Wemple. (ECF No. 21 at 28.) However, following her visit with Dr. Wemple, Plaintiff did attend an office visit with Dr. Molsee on September 17, 2012, (AR 342,) and Dr. Swenson on October 31, 2012, (AR at 341). One missed doctor's appointment in a medical record spanning from 2009 through 2015 does not clearly convince the Court that Plaintiff's pain testimony should be discredited.

For the foregoing reasons, the Court does not adopt the Magistrate's conclusion that the ALJ properly considered Plaintiff's alleged noncompliance in discrediting her testimony. Thus, the Court finds that Plaintiff's alleged noncompliance, if any, is not a clear and convincing reason to discredit Plaintiff's subjective testimony.

3:16-cv-03021-GPC-JMA

## vi.     Inconsistent Statements

The Magistrate found that the ALJ properly considered Plaintiff's inconsistent statements in discrediting Plaintiff's symptom testimony.  (ECF No. 21 at 29.)  Plaintiff objects generally to the ALJ's use of inconsistent statements to discredit her subjective testimony.[16]

An ALJ may properly rely on statements by the claimant that are inconsistent with her own statements or actions, or with the medical evidence.  *See Verduzco v. Apfel*, 188 F.3d 1087, 1090 (9th Cir. 1999).  In fact, the ALJ "[m]ay consider a range of factors in assessing credibility, including . . . 'ordinary techniques of credibility evaluation, such as . . . prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid.'"  *Ghanim*, 763 F.3d at 1163 (quoting *Smolen*, 80 F.3d at 1284).

Plaintiff has not articulated a specific objection and only generally disagrees with the Magistrate's findings as to her inconsistent statements.  This Court nonetheless reviews the Report for error.[17]  The Magistrate analyzed the ALJ's finding that Plaintiff made several inconsistent statements about matters such as: Plaintiff's inability to cook and clean, her church attendance, her inability to focus, and her grogginess.[18]  Reviewing

---

[16] "[T]he Magistrate finds the ALJ[] can use inconsistent statements . . . and the lack of objective evidence overall.  None of these factors negate Lake's credibility as to her pain from [FM]."  (ECF No. 22 at 8.)

[17] *See generally Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505, 508-09 (6th Cir. 1991) (A party's general objections are not sufficient to challenge a magistrate judge's findings); *see also Arbor Hill Concerned Neighborhood Ass'n v. County of Albany*, 281 F. Supp. 2d 436 (N.D.N.Y. 2003) ("[w]hen parties make only frivolous, conclusive or general objections, the court reviews the report-recommendation for clear error.") (internal citations omitted).

[18] The ALJ found that:

> The claimant has made inconsistent statements.  For instance, at the consultative examination, the claimant indicated her daughter does most of the household cleaning and cooking, due to the claimant's pain.  However, in her function report, completed just a few months earlier, she stated that she cooks her own meals on a daily basis and completes household chores on a weekly or daily basis.  At the hearing, she testified that

the record for inconsistencies in Plaintiff's statements is within the purview of ALJ's consideration when making a credibility determination. *See Verduzco*, 188 F.3d at 1090. The ALJ pointed out a number of clear and specific examples of inconsistencies in the record. Thus, the Court finds that the ALJ provided clear and convincing reasons for discounting Plaintiff's credibility based on her inconsistent statements.

### vii. Ability to Drive

The Magistrate found that Plaintiff's ability to drive is not a clear and convincing reason to discount her testimony. (ECF No. 21 at 29.) Plaintiff agrees.[19]

The Magistrate states that even Defendant "appears to concede this does not constitute a clear and convincing reason to discount Plaintiff's testimony." (ECF No. 21 at 29.) This Court notes that there have been no objections raised by Defendants as to this basis. The ALJ stated, "While [Plaintiff] contends that her functional abilities are severely limited, it is difficult to reconcile the fact that she testified she operates a motor vehicle." (AR 26.) However, Plaintiff need not be "utterly incapacitated" to be disabled. *See Vertigan*, 260 F.3d at 1050. Thus, the Court agrees that Plaintiff's ability to drive does not constitute a clear and convincing reason to discredit her testimony.

### viii. Objective Medical Evidence

The Magistrate opines, "[w]hile the ALJ did not err by considering whether Plaintiff's symptoms were supported by objective medical evidence, . . . this factor

---

she does not do most of the chores. Yet, in her function report, she indicated she completes household chores on a weekly or daily basis. In her function report, she stated she attends church, but at the hearing, she inconsistently testified she does not attend church. The claimant's allegations that she gets groggy and loses the ability to focus is also inconsistent with her ability to read novels, drive and play complex story-based video games such as "Mafia Wars." The claimant testified she played that game multiple hours and liked to chat with people all over the world and cut back due to becoming too addicted, not due to grogginess or an inability to focus.

(ECF No. 21 at 28-29; AR 25 (internal citations omitted).)

[19] Plaintiff reiterates, "the fact she can drive does not discredit her statements as to pain and her inability to function." (ECF No. 22 at 7.)

3:16-cv-03021-GPC-JMA

neither weighs in favor of nor detracts from the ALJ's analysis of Plaintiff's pain testimony. (ECF No. 21 at 30.)

The Magistrate points out, "an ALJ may not disregard a claimant's testimony 'solely because it is not substantiated affirmatively by objective medical evidence.'" (ECF No. 21 at 29 (quoting *Robbins*, 466 F.3d at 883).) However, "the ALJ may consider whether the alleged symptoms are consistent with the medical evidence as one factor in her evaluation." (*Id.* (citing *Lingenfelter*, 504 F.3d at 1040; *Burch*, 400 F.3d at 681).)

To the extent that Plaintiff specifically objects to this finding, she argues that "[FM] can *only* be evaluated using the patient's subjective testimony." (ECF No. 22 at 6 (citing *Revel v. Berryhill*, 874 F.3d 648 (9th Cir. 2017); *Benecke v. Barnhart*, 379 F.3d 587, 590 (9th Cir. 2004)) (emphasis added).) Plaintiff relies on the Ninth Circuit's opinion in *Revel*,[20] but this Court finds those facts distinguishable from the case at bar.

In *Revel*, the Ninth Circuit determined that the ALJ gave no weight to the plaintiff's rheumatologist, who reported that Revel could "very seldomly lift and carry up to ten pounds or climb stairs, bend, stoop, crouch, kneel, or crawl." 874 F.3d at 658. The rheumatologist also found that Revel had a limited capacity to stand, walk, and sit throughout a working day.[21] *Id.* Revel would need frequent breaks, and she would miss work at least seventy-five percent of the time, if employed. *Id.* In addition, the ALJ failed to state a germane reason for rejecting the findings made by Revel's physical therapist that Revel had "20 minutes of maximum standing tolerance . . . [and] she would

---

[20] Arguing that the ALJ has failed to provide a legally sufficient reason for rejecting her symptom testimony, Plaintiff offers the following excerpt: "These errors arose from an apparent fundamental misunderstanding of [FM]. The ALJ failed to properly analyze Revels' [FM]-related symptoms under SSR 12-2p, issued in 2012, and our court's 2004 opinion in *Benecke v. Barnhart*. This appears to be a recurrent problem." (ECF No. 22 at 6;) *see Revel*, 874 F.3d at 662.

[21] "Revel could sit for forty minutes at a time, for a total of three hours per day; stand for one hour at a time, for a total of three hours per day; and walk for twenty minutes at a time, for a total of two hours per day . . . she needed to recline for at least one hour per day and alternate between sitting and standing positions every forty minutes." *Revel*, 874 F.3d at 658.

not be able to exert up to 10 lbs. of force occasionally and/or exert a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects." *Id.* at 659, 668. Revel's physical therapist concluded that "these limitations rendered her unable to maintain any sustained functional work position in order to function at a rate conducive to gainful employment." *Id.* at 659 (internal quotation omitted).

By contrast, the ALJ in Plaintiff's case gave "significant weight" to the opinions of Dr. Hamilton and Dr. Hale when considering the credibility of Plaintiff's subjective testimony related to her functional limitations. (AR 27.) Unlike Revel, Plaintiff's doctors found no limitation on her capacity to sit, stand, and walk. (*See* AR 92, 370.) The doctors also agreed that Plaintiff was capable of lifting twenty-five pounds frequently and fifty pounds occasionally. (*See* AR 92, 371.) In addition, Dr. Hale opined that Plaintiff "can frequently stoop, crouch, kneel, crawl, and occasionally climb ladders, ropes or scaffolds." (AR 27, 92.) The ALJ did not consider these physical findings in isolation, but compared them to Plaintiff's own testimony about her ability to carry out household chores, travel, exercise, host friends for dinner, and work in the garden. (AR 27-28.) Accordingly, the ALJ did not rely solely on the objective medical evidence, but properly considered it as one factor in rendering an adverse credibility finding. *See Lingenfelter*, 504 F.3d at 1040; *Burch*, 400 F.3d at 681. The ALJ recognized that Plaintiff may have some pains and aches, (AR 27,) and this Court acknowledges that FM produces "pain that may fluctuate in intensity and may not always be present." *Rollins v. Massanari*, 261 F.3d 853, 863 (9th Cir. 2001). However, the ALJ's observation that Plaintiff had few objective findings to support her allegations of limited functional capacity remains accurate. (*See* ECF No. 21 at 29.) Thus, the Court finds that the ALJ articulated sufficiently clear and convincing reasons for discrediting Plaintiff's subjective testimony based on the objective medical evidence.

In sum, this Court finds that the ALJ provided the following clear and convincing justifications for discrediting Plaintiff's subjective testimony: Plaintiff's work history,

inconsistent statements, and objective medical evidence. Meanwhile, the Court finds the ALJ erred in relying on Plaintiff's unemployment benefits, reason for leaving her previous job, daily activities, noncompliance, and ability to drive. Yet, "[e]ven when the ALJ commits legal error, we uphold the decision where that error is harmless." *Treichler*, 775 F.3d at 199; *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) ("We have long recognized that harmless error principles apply in the Social Security Act context.") The ALJ's analysis need not be extensive, but it "must provide *some* reasoning in order for [the court] to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence." *Brown-Hunter*, 806 F.3d at 495 (emphasis added); *see Ash v. Berryhill*, 676 Fed. App'x. 632 (9th Cir. 2017) (finding the ALJ did not err in finding plaintiff's pain and symptom testimony less than credible based on two specific, clear and convincing reasons). As the Magistrate points out, "an ALJ's assessment of symptom severity and claimant credibility is entitled to 'great weight.'" (ECF No. 21 at 30 (quoting *Weetman v. Sullivan*, 977 F.2d 20, 22 (9th Cir. 1989)).) Here, the ALJ has offered three specific, clear and convincing reasons for discrediting Plaintiff's subjective testimony. Therefore, the Court concludes the ALJ's adverse credibility finding is sufficiently supported by substantial evidence.

### 3.    Nonexamining Physician Opinions and Mental Limitations

Plaintiff argues that the Magistrate erroneously supported the ALJ's failure to give weight to Plaintiff's specialists because of a lack of objective findings about her ability to work. (ECF No. 22 at 8, 9.) She contends that this decision was in error because (i) non-examining and "non-treating doctors under SSR 12-2p cannot be given weight at all," (ECF No. 22 at 8,) and (ii) FM is diagnosed entirely on the patients' subjective reports of pain and other symptoms. (*Id.* at 9.)

Plaintiff attempts to bolster her argument by pointing out that "[t]he ALJ gives great weight to Dr. Hamilton but [Dr. Hamilton] does not observe [Plaintiff] or evaluate her for [FM] as to tender points." (*Id.* at 8.) However, Plaintiff's assertion is simply not

true.  Indeed, the record reflects that Dr. Hamilton found Plaintiff tender to touch with light palpations in eighteen areas consistent with [FM] trigger points.  (AR 370.)  The record further reflects that before rendering a diagnosis of FM, Dr. Hamilton discussed and considered Plaintiff's subjective reports of pain and other symptoms, including: Plaintiff's twenty years of spontaneous back pain, constant stabbing pain without radiating symptoms, an aching quality throughout her body, and the exacerbation of her symptoms in cold weather.  (*Id.* at 367.)  Assuming arguendo that the Court were to accept Plaintiff's argument as legally sound, she nonetheless fails to demonstrate (i) that Dr. Hamilton is a non-examining physician and (ii) that her FM was not diagnosed based on her subjective symptom reports.[22]

Plaintiff makes a secondary argument.  She states that the Magistrate's Report conflicts with 20 C.F.R. § 404.1520a, which requires the ALJ to use special procedures when considering disability based on mental impairment.  (ECF No. 22 at 10.)  Plaintiff contends that the ALJ is required to provide a narration of mental evaluation and to address global functioning limitations.  (*Id.* (citing 20 C.F.R. § 404.1520a).)  Plaintiff notes that the ALJ does address global functioning but does not address the limitations stated in Dr. Griffin's report, including Plaintiff's alleged inability to work full-time.  (ECF No. 22 at 10.)

Where there is evidence of a mental impairment, the SSA has implemented a special psychiatric review technique to determine whether the claimant's impairment or combination of impairments is severe.  *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 725 (9th Cir. 2011); *see also* 20 C.F.R. § 404.1520a.  Specifically, the reviewer must

---

[22] The Court notes that a review on the merits of Plaintiff's legal argument would nevertheless produce an outcome adverse to Plaintiff.  Plaintiff contends, "The Magistrate states that there must be objective opinion as to **whether Lake can work**.  However, [FM] is based . . . "entirely [on] the patients' reports of pain and other symptoms . . . there are no laboratory tests to confirm the **diagnosis**."  (ECF No. 22 at 9 (internal citations omitted) (emphasis added).)  This assertion is yet another display of Plaintiff's fundamental misunderstanding of the distinction between a compensable disability that would inhibit her ability to work versus a recognized FM diagnosis.  *See* discussion of Plaintiff's first Objection *supra*.

(i) determine whether an applicant has a medically determinable mental impairment; (ii) rate the degree of functional limitation for four functional areas including, activities of daily living; social functioning; concentration, persistence or pace; and decompensation; and (iii) determine the severity of the mental impairment based in part on the degree of functional limitation. *Keyser*, 648 F.3d at 725 (internal citations omitted).  The ALJ's written decision "must incorporate the pertinent findings and conclusions based on the technique" and "must include a specific finding as to the degree of limitation in each of the functional areas." 20 C.F. R. § 416.920(e)(4).  "Assessment of functional limitations is a complex and highly individualized process that requires [the SSA] to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [a claimant's] overall degree of functional limitation." 20 C.F.R. § 404.1520a(c)(1).

First, "[t]he ALJ found Plaintiff had medically determinable impairments of mood disorder, anxiety disorder, alcohol abuse, and depression." (*See* ECF No. 21 at 35 (citing AR 21-22).)  Next, the ALJ engaged in a detailed review of the four functional areas in order to rate the degree of functional limitation.  (AR 21-22.)  To summarize, the ALJ found that in the first functional area, activities of daily life, Plaintiff's limitations are mild.  (AR 21.)  The ALJ came to this conclusion after addressing Plaintiff's reports of self-care, walking, standing, using the computer, reading, yard work, household chores, shopping routines, engagement in outdoor activities, and hobbies.  (*Id.*)

In the second functional area, social functioning, the ALJ found no more than a mild limitation.  (AR 22.)  This conclusion was predicated on Plaintiff's communicative use of telephone and video chatting, as well as social media (i.e. Facebook).  (AR 21-22.)  The ALJ also considered Plaintiff's time spent with others, her involvement with church, the long-term relationship with her boyfriend, and her interactions with family and friends.  (AR 22.)  The ALJ acknowledged that Plaintiff's social activities are reduced due to pain, but noted that Plaintiff had not reported a reduction stemming from her mental impairments.  (*Id.*)

As to the third functional area—concentration, persistence, or pace—the ALJ found no more than a mild limitation.  (AR 22.)  Here, the ALJ addressed Plaintiff's trouble concentrating for more than fifteen minutes but also noted several inconsistencies.  (*Id.*)  For example, Plaintiff reports no trouble remembering to take medication, she is able to manage her own finances, she can see tasks through to completion, and she is capable of following written and spoken instructions.  (*Id.*)  In addition, the ALJ discussed Plaintiff's consultative examination with Dr. Griffin, which denoted only slight impairments in memory and judgment.  (*Id.*)

The ALJ found that Plaintiff presented no limitations as to the fourth functional area—episodes of decompensation.  (*Id.*)

Finally, the ALJ evaluated the severity of Plaintiff's mental impairment based on the degree of her functional limitations, as well as the findings reported in Dr. Griffin's mental examination.  (AR 22-23.)  Plaintiff contends that the ALJ's did not address Dr. Griffin's suggested limitations.  (ECF No. 22 at 10.)  Yet, the ALJ expressly gives "significant weight" to Dr. Griffin's findings and specifically addresses Dr. Griffin's opinion that Plaintiff "would be able to engage in full time work within the next 12 months with treatment."  (AR 22.)  The ALJ's evaluation is the same whether articulated as Plaintiff's *limitation* to part-time work over the next twelve months, or Plaintiff's *ability* to engage in full-time work after the twelve month period has expired.  Further, the ALJ's assessment of functional limitations need not be confined to Dr. Griffin's report.  *See* 20 C.F.R. § 404.1520a(c)(1).  Here, the ALJ engaged in a highly individualized inquiry by considering not only Dr. Griffin's suggestions, but also the evaluations made by Dr. Covell and Dr. Donahue, as well as Plaintiff's own testimony.  (*See* AR 21-23.)  As a result, the Court finds that the ALJ properly addressed and considered a range of relevant evidence (including Dr. Griffin's suggested limitations) to obtain a longitudinal picture of Plaintiff's overall degree of functional limitations.  Thus,

3:16-cv-03021-GPC-JMA

the Court finds no error in the ALJ's application of the special procedures set forth in 20 C.F.R. section 404.1520a or the Magistrate's analysis thereof.

### 4. Fibromyalgia and Mental Limitations under SSR 12-2p and SSR 82-62

In her final objection, Plaintiff argues that the Magistrate's findings conflict with SSR 82-62 and SSR 12-2p, which require the ALJ to address Plaintiff's limitations as to FM and mental impairments when determining past work.[23] While Plaintiff has raised concerns regarding the ALJ's application of SSR 12-2p throughout her briefs, she raises her SSR 82-62 argument for the first time in her Objections.

SSR 82-62[24] states, "Since the severity of the impairment(s) must be the primary basis for a finding of disability, evaluation begins with a determination of the claimant's

---

[23] Plaintiff further argues that she was laid off because of her inability to function as a bookkeeper. (ECF No. 22 at 11.) She cites the Magistrate's Report at page thirty-nine. (*Id.*) However, the Court finds no indication that Plaintiff was laid off at all, neither on page thirty-nine of the Report nor anywhere else in the record. Further, there is no indication that Plaintiff left her job due to an inability to function. In fact, Plaintiff told Dr. Griffin that she left her job in 2011 because of "stupidity, I met a man online and left my husband of 30 something years." (AR 411.) In Plaintiff's motion for summary judgment, she states that she left her job in 2011 because she was having difficulty functioning. (ECF No. 13 at 20 (citing AR 53).) However, during the administrative hearing Plaintiff was directly asked, "Why'd you stop working?" (AR 41.) Plaintiff responded, "I left my husband and moved out of state and tried to find employment here in Washington." (*Id.*) Thus, the Court finds no merit to this argument.

Also, Plaintiff states that "in [her] opening brief," she argues that "she is not required to work at a job at an advanced age which entails more physical strength" than in her previous jobs. (ECF No. 22 at 11.) Plaintiff provides no citation directing the Court to this argument allegedly made in her opening brief, and she provides no legal authority or analysis for this assertion in her Objections. (*See id.*) The Court has nonetheless reviewed the administrative record, as well as Plaintiff's filings with the Court. The Court finds no such argument in the record. (*See, e.g.*, ECF Nos. 1, 13.) Accordingly, the Court finds Plaintiff's assertion that she is unable to work at a job at an advanced age which entails more physical strength than her previous jobs without merit as the ALJ determined that she is capable of doing her previous job as a bookkeeper. (AR 28 ("she would still be able to perform her past relevant work as a bookkeeper").)

[24] The purpose of SSR 82-62 is "[t]o state the policy and explain the procedures for determining a disability claimant's capacity to do past relevant work (PRW) as set forth in the regulations, and to clarify the provision so that they will be consistently applied." SSR 82-62, 1975-1982 Soc. Sec. Rep. 809, 1982 WL 31386, at *1 (Jan. 1, 1982).

functional limitations and capacities to sit, stand, walk, lift, carry, etc." SSR 82-62 at *2 (citing SSR 82-51; PPS-85: Guidelines for Residual Functional Capacity Assessment in Musculoskeletal and Cardiovascular Impairments).)  The guideline further informs DIB claimants, "*Your impairment must prevent you from doing past relevant work*.  If we cannot make a decision based on your current work activity or on medical facts alone, and you have a severe impairment, we then review your residual functional capacity [RFC] and the physical and mental demands of the work you have done in the past.  If you can still do this kind of work, we will find that you are not disabled." SSR 82-62 at *1 (citing 20 C.F.R. §§ 404.1520(e), 416.920(e)).

The ALJ correctly found that Plaintiff is capable of performing past relevant work as a bookkeeper and that "[t]his work does not require the performance of work-related activities precluded by the claimant's residual functional capacity" pursuant to 20 C.F.R. section 404.1565.[25]  (AR 28.)  Before arriving at this conclusion, the ALJ evaluated the vocational expert's testimony, who opined that Plaintiff would be able to perform her past relevant work even if she were required to alternate positions between sitting and standing.[26]  (*Id.*)  In addition, the ALJ compared Plaintiff's RFC with the physical and mental demands of bookkeeping work.  (*Id.*)

In assessing Plaintiff's RFC, the ALJ evaluated Plaintiff's capacities to sit, stand, walk, lift, and carry, as well as her physical limitations.  In doing so, the ALJ considered Plaintiff's own testimony that her daily activities include, but are not limited to, walking, standing, using the computer to chat, reading, and some yard work.  (AR 25.)  In addition, the ALJ gave "significant weight to the opinion of the physical consultative

---

[25] SSR 82-62 applies to 20 C.F.R. § 404.1565.  *See* SSR 82-62 at *1.
[26] The ALJ noted that this testimony is consistent with the DOT with the exception of the sit/stand option, which the DOT does not address.  (AR 28.)  The ALJ accepted the vocational expert's testimony "based on his level of experience and expertise."  (*Id.*)

examiner, Dr. Hamilton[, who] noted that while [Plaintiff] experiences pain, this limits her motor strength without any true deficits." (AR 27.) Dr. Hamilton opined,

> [Plaintiff] is capable of the maximum sitting, standing, and walking capacity in an eight-hour workday. She is capable of lifting 50 pounds occasionally and 25 pounds frequently. She should avoid climbing ladders, ropes and scaffolds, and should avoid working around heights, heavy machinery, extreme temperatures, and chemicals due to her sensation and balance impairment.

(AR 27, 370-71.) The ALJ also gave significant weight to Dr. Hale's findings. After examination, Dr. Hale determined that Plaintiff had the capacity to "lift 25 pounds frequently and 50 pounds occasionally." (AR 27, 92.) She can also sit or stand for more than six hours in an eight-hour workday. (*Id.*) "She can frequently stoop, crouch, kneel, crawl, and occasionally climb ladders, ropes or scaffolds." (*Id.*) Finally, Dr. Hale found that Plaintiff should "avoid concentrated exposure to extreme temperatures, vibration, and hazards." (AR 27-28; 93.)

The ALJ also considered the extent of Plaintiff's mental impairments, comparing her reported "grogginess and an inability to focus" to her ability to read novels, drive, and play complex story-based video games such as "Mafia Wars." (AR 25.) The ALJ emphasized Plaintiff's testimony where she reports playing the game multiple hours and chatting with people all over the world. (*Id.*) According to Plaintiff, she cut back on playing the game "due to becoming too addicted, not due to grogginess or an inability to focus." (*Id.*) The record also reflects a finding by Dr. Griffin that, despite Plaintiff's mood and anxiety disorders, she would be able to engage in training, work part-time, and work full-time after a twelve-month treatment period. (AR 413.) After this thorough review, the ALJ concluded that Plaintiff is able to perform her past relevant work as a bookkeeper. (AR 28.)

Plaintiff secondarily argues that the ALJ improperly applied SSR 12-2p as it relates to her ability to engage in her past work as a bookkeeper. Specifically, Plaintiff

states that "SSR-12-2p requires the ALJ to use [Plaintiff's] limitations of [FM] when determining past work and apply[ing] the Medical Vocational Rules." (ECF No. 22 at 12.)

The Court also rejects Plaintiff's argument that the ALJ failed to consider her FM limitations when determining past work under SSR 12-2p. The Court arrives at this conclusion for the same reasons it has rejected the Plaintiff's SSR 82-62 argument—the ALJ's evaluation of the vocational expert's testimony as consistent with other objective medical findings and Plaintiff's RFC. Again, the record is clear that the ALJ considered plaintiff's physical limitations related to FM, as well as her mental impairments "[a]fter careful consideration of the entire record," (AR 24,) including Plaintiff's own testimony and the examinations performed by Dr. Hamilton, Dr. Hale, and Dr. Griffin. (AR 24-28.)

## CONCLUSION

Based on the foregoing review of the relevant law and the administrative record, the Court finds that the ALJ applied the correct legal standards when she denied Plaintiff's claim and that her conclusions are supported by substantial evidence. Therefore, the Court **ADOPTS IN PART** the Report (ECF No. 21) and will **DENY** Plaintiff's Motion for Summary Judgment (ECF No. 13) and **GRANT** Defendant's Motion for Summary Judgment (ECF No. 16.) The Clerk of Court shall close the case.

**IT IS SO ORDERED.**

Dated: March 26, 2018

Hon. Gonzalo P. Curiel
United States District Judge